On April 2, 2002, the Tuscaloosa County Department of Human Resources ("DHR") filed an action against S.E. ("the mother") and J.E. III ("the father") in the Tuscaloosa Juvenile Court ("the trial court"), seeking the termination of the mother's and father's parental rights as to G.E. ("the daughter") and J.E. IV ("the son"). (The mother and the father are hereinafter referred to collectively as "the parents"; the daughter and the son are hereinafter referred to collectively as "the children.") On May 30, 2002, J.E. II ("the grandfather") filed an action in the trial court seeking to have custody of the children placed with him and the grandmother. The trial court appointed a guardian ad litem to represent the interests of the children. On August 19, 20, and 23, 2002, the trial court held a hearing and received ore tenus evidence. On October 3, 2002, the trial court entered separate judgments terminating the parental rights of both the father and the mother, denying the grandfather's custody request, and placing the children in the custody of DHR to be placed for adoption. The mother and the father filed separate appeals.
According to the record, the parents were married at the time of the appeals and were living in a mobile home on the grandparents' property. The father was 26 years old at the time of the termination hearing. The daughter was born on April 8, 1996, and the son was born on May 20, 2001. The record indicates that DHR took custody of the daughter in late 2000, when she was four years old; DHR has had custody of the son since his birth.
The trial court heard the testimony of Jean Channel, a school nurse who has been employed by the Tuscaloosa Board of Education for 23 years. Channel worked at the Sprayberry Original Education Center ("the center"), screening new students for educational and medical assessments; the daughter was enrolled at the center following a referral by the Alabama Institute for the Deaf and the Blind. According to Channel's testimony, the daughter had been diagnosed with poor eyesight, tibial-torsion (severely bowed legs), two abscessed front teeth, and sporadic seizures; Channel also indicated that those health problems had never been treated by a medical professional. Additionally, Channel testified that the daughter often came to the center in clothes that were too small and in diapers that were also too small and that were occasionally soiled.
The center instructed the mother in the identification of and in the treatments for the daughter's medical needs. According to Channel, the mother initially complied with the instructions, but she failed to follow through for a sustained period. Channel testified that the mother was very childlike and "needed someone to . . . take her by the hand and help her to take care of her child." *Page 666 
After meeting with the mother on several occasions, Channel determined that the mother was "a virtual prisoner . . . in her own home." Channel testified that the mother confided in her that she was not allowed to talk when the father came home from work and that, on occasion, the mother and the daughter would sit in a closet so the daughter's noise would not upset the father.
Channel stated that, on one occasion, the daughter missed several days from the center and when she returned she had a black eye and a cut above her eye. Channel testified that the mother explained the daughter's injuries by indicating that the father tried to "attack" and "choke" the daughter and her. On cross-examination, however, Channel acknowledged that some of the bruises on the daughter's body were consistent with typical childhood accidents. Based on the foregoing information, the center contacted DHR; based on DHR's initial investigation, the daughter was placed in the care of a foster parent. Channel testified that the daughter responded very well to the foster parent's care, which reduced Channel's interaction with the daughter.
Pam Strickland became the daughter's foster parent in late October 2000; she became the son's foster parent shortly after his birth in mid-2001. Strickland testified that she has been trained in the therapeutic aspects of raising special-needs children.[1] Strickland took the daughter to the dentist for treatment for her two abscessed teeth; she testified that the teeth were black and worn down to "stubs." According to Strickland, when the daughter arrived in her home, she was not toilet trained; however, Strickland was able to toilet train the daughter within a week or two. Strickland testified that the daughter spoke only four or five words when she arrived in her home but that the daughter's speech and physical dexterity have improved while in Strickland's care. Strickland testified that the daughter lacks reasoning skills and cannot control her impulses, which, Strickland says, often leads to destructive or aggressive behavior.
According to Strickland, the son has several medical conditions that qualify him as a special-needs child. The son has asthma and requires a breathing machine; a caretaker must supervise the son throughout his breathing-machine treatments. In addition to the asthma, the son has acid reflux, which has damaged parts of his throat, his nodules, and his vocal cords; because of the acid reflux, the son drinks specialized liquids from a modified children's cup. The son suffers from eczema and must take short baths and use special lotions that are applied to both the eczema and to his uninfected skin. Strickland testified that, as a result of the son's asthma, she has had to perform mouth-to-mouth resuscitation on the son and once had to rush the son to a hospital emergency room because he had quit breathing.
Strickland testified that the children's schedule was regimented and required constant attention to detail. Strickland testified that the schedule for the son's asthma medication changes frequently; she opined that keeping up with the son's medical condition requires personal initiative on the part of the son's caretaker. According to Strickland, the son's asthma medication contains adrenaline, which keeps him up late at night; the daughter awakens early and is rambunctious throughout the day, but goes to bed at 8:00 p.m. *Page 667 
April Lane, the coordinator of the Indian Rivers Mental Health Clinic's intensive children's services program, testified that she evaluated the standardized DHR reports completed on the daughter, including a report from Strickland. Lane, who holds a Ph.D. in counseling from the University of Alabama, a master's degree in family studies from Pennsylvania State University, and a bachelor's degree in child development from Ohio Wesleyan University, diagnosed the daughter as having an attachment disorder, meaning that the daughter experienced a "lack of primary early attachment" that has "pervasive effects intellectually, socially, [and] emotionally." Lane testified that attachment disorder can be caused by abuse, neglect, poor day-care facilities, or being raised by parents who had poor childhood experiences. Lane testified that the daughter's inability to control her impulses is a sign of attachment disorder and that such a disorder could lead to sociopathic behavior if left untreated. According to Lane, mature, emotionally strong parents are the best treatment for an attachment disorder. Lane testified that children with an attachment disorder must be given a great deal of structure and that the primary caregiver of a child with an attachment disorder should possess much patience.
Stacey Bonner, the social worker assigned to the children and the parents, met with the parents on seven different occasions from August 23, 2000, through March 5, 2001, to discuss their Individualized Service Plan ("ISP"). Bonner also inspected the parents' house and recommended changes that would enhance the children's safety, such as repairing holes in the floor of the house. The father completed a domestic-abuse-awareness course recommended by Bonner after "dropping out" of a previous course on that subject. According to Bonner, it was necessary for the parents to attend DHR's 12-week parent-training program for 8 to 9 months because they were unable to retain and build on the information provided in the program from week to week.
Bonner expressed concern about the parents' and the grandparents' ability to care for the son because he requires constant attention and averages five medical appointments each month; the parents have been to only one of the son's medical appointments. The fact that the parents have only one vehicle concerned Bonner because of the son's medical problems.
Bonner testified that the parents and the grandparents were allowed to visit the daughter for one hour per week and that their behavior during those visits was "peculiar." The mother was often "withdrawn" during the visitation, but Bonner admitted that the mother's behavior could have been caused by her depression. According to Bonner, the father was often angered by the daughter's behavior during the visitation and responded in an inappropriate manner, such as by leaving the visitation room. She stated that on one occasion the father left the visitation to sleep in his vehicle; the father denied that allegation. Bonner indicated that the parents argued in front of the daughter during the visitations and that, on occasion, they brought books and newspapers with them into the one-hour visitation.
According to Bonner, the parents would occasionally bring well-intentioned yet inappropriate gifts for the daughter, such as a professional-wrestling video and a professional-wrestling T-shirt. Bonner noticed that the father was angered when the daughter did not express any interest in these gifts. Bonner recalled an instance where the daughter threw a stuffed animal at the father and he threw it back at her. The father testified that his response was playful; Bonner agreed, but testified that *Page 668 
his action was still inappropriate. In Bonner's presence, the grandfather made inappropriate comments to the daughter such as "if you don't hug me, I'm gonna shoot you." Bonner testified that, even though the grandfather's comment was a joke, it was an inappropriate comment for a special-needs child. According to Bonner, the daughter responded well to the mother and the grandmother but not to the father or the grandfather.
Bonner identified other instances demonstrating the parents' and the grandparents' lack of adequate parenting abilities. Bonner testified that the father failed to react to an incident when the son was choking and spitting-up during a visitation, even though the father was holding the son; however, the mother was complemented by the DHR staff for her reaction to that situation. Bonner recalled conversations in which the parents and the grandmother stated that perhaps they should give up custody of the children because they did not know how to handle the special needs of the children.
Bonner testified that the financial situation of the parents and the grandparents was a concern. The grandfather is disabled and receives a disability check of $386 per month as his only income. Upon an inspection of the grandparents' house, Bonner determined that the grandparents did not have adequate space for the baby crib and the son's breathing machine. Further, Bonner testified that the grandmother might have contributed to the daughter's attachment disorder because the daughter often spent time with the grandmother in her formative years.
According to Bonner, the parents and the grandparents love the children, and she stated that the parents "have maintained contact" and "regular visits" with the children. Bonner testified that the parents generally brought appropriate gifts to the visitations, including clothes, baby-wipes, diapers, cookies and other snacks, jumpsuits and a toy for the son, and coloring books for the daughter on her birthday. Bonner testified that a March 15, 2002, ISP report generated by DHR states the parents' positive attributes as love for the children, attendance at all necessary meetings, and their family support.
Riley Lumpkin, a licensed counselor, was assigned by DHR to counsel the father on managing his anger. Lumpkin testified that, according to the father, the majority of the domestic abuse in the parents' relationship was initiated by the mother, and that, according to the father, his physical abuse was simply a defensive response to her physical abuse. Based on his personal observations, Lumpkin determined that the father had severe self-esteem issues caused by the grandfather's controlling and demeaning personality. Lumpkin testified that the father had been very honest with him during the counseling sessions and that his anger management was greatly improved. Lumpkin believes that the father would handle the return of the children to the home better than the mother would.
As an incident to counseling the father, Lumpkin also spoke with the mother on several occasions. According to Lumpkin, the mother came from a very abusive home and her mother was a schizophrenic. Lumpkin concluded that the mother suffered from depression that he believes would affect her ability to handle the children in an emergency situation. Lumpkin testified that, even though the parents had made some progress, the children's safety would be compromised if they were returned to the parents' home.
Darlene Terry is a licensed social worker who was assigned to teach the mother skills such as coping, parenting, and financial *Page 669 
management; Terry visited with the mother 90 times through September 2000. Terry testified that the mother had a compliant and submissive personality. According to Terry, the mother's insecurities were normal reactions to stress, and her indecisiveness was typical of a dependent woman who, because of her mother's mental illness, was a "motherless" child. According to Terry, the mother quite often feels empowered as a parent, but she is aware of the children's special needs and is afraid she cannot fulfill those needs. Terry testified that the mother is not as fearful as she used to be but that she is almost wholly dependent on the father and the grandparents.
Terry testified that she initially felt that the parents should take the son home after his birth, but that the parents refused. Further, the parents requested that their visitation with the son be reduced from one visit per week to one visit every two weeks; Terry stated that she could not "fathom" why they did not want to visit their son as frequently as possible. Terry identified signs of postpartem depression in the mother, which Terry attributed to the birth of the son by Cesarian Section. Terry testified that, as far as meeting someone else's needs, the mother is primarily concerned with the father. According to Terry, the mother and father were not capable of handling two special-needs children.
The father testified that Rebecca McKinley, a counselor who specialized in parent-child relationships and disciplinary issues, also met with him at DHR's request. According to the father, McKinley taught him to deal with the daughter's attention-deficit disorder and spatial delay. The father stated that the daughter has always been aggressive, defiant, and rebellious. Although he denied ever yelling at or shaking the children when he was angry, the father testified that he had learned less physical methods of discipline, such as "time out." The father was prescribed the antidepressant Paxil in order to reduce his stress.
According to the father, the grandparents would continue to play a role in the lives of the parents and the children because they live next door to the parents and often assist with the children's care. The father testified that he would continue to rely on the grandparents for financial assistance. The father stated that the the grandparents have reliable transportation that would be of assistance if the son had an emergency medical situation.
The father testified that he rarely visited the son in the intensive-care unit after his birth because at the time the father was employed driving a truck for Birmingham Beverage. Peggy Thornton, the managing nurse of the neonatal unit, testified that the nurses' reports indicated a lack of parental involvement during the time the son was in intensive care. The father testified that he did not visit the son in August 2001, when the son stopped breathing and was rushed to Children's Hospital while in Strickland's care because he believed that he could not be in the same area as "the foster mother." The father acknowledged that neither he nor the mother had attended the children's medical appointments in the last year.
The father, who had previously questioned his own ability to care for the children, testified that the training he received from DHR had alleviated some of his doubts about raising his special-needs children. The father testified that he completed CPR training in order to be prepared if the son has an asthma attack and that he is familiar with the son's prescription medications. The father stated that the parents have developed a new schedule that would provide for the children's needs *Page 670 
and maximize both parents' time with the children.
At the time of the termination hearing, the father was employed as a cashier earning $7 per hour, and he worked from 10:00 p.m to 6:00 a.m. The father testified that he had health insurance for himself, and that he could upgrade that coverage to coverage for his family for $135 per month. The father admitted that he had filed a petition in bankruptcy and that he was not current with the court-ordered child-support payments until he received an income-tax refund of $4,000, which was applied to the past-due child-support payments. We note that there was some testimony indicating that Strickland, the foster parent, should have received the dependent-child tax credit the parents claimed on their income-tax return because the children had resided in her home for more than eight months of the tax year.
The father has attended every scheduled visit with the daughter since DHR took custody in 2000. The father testified that he and the mother could not see the son for several months but that they now see him once every two weeks. The father testified that he and the mother visit the son only once every two weeks because "[the son] is nervous about seeing us really." The father testified that the son was only able to stay with the parents for 25 minutes during the visitations because a bond had not formed between the son and them; other testimony confirmed that the son cried throughout the parents' visitations. The father also admitted that on a few visits the daughter has said "daddy mean" and has refused to hug him goodbye.
The mother admitted that the daughter had not been to a dentist until she was taken into DHR's custody. The mother stated that she noticed the daughter's rotting teeth, but that she did not take her to a dentist because "a close relative" told her that those "baby" teeth would eventually fall out on their own. After first testifying that he could not recall, the father admitted that he knew that the daughter's front teeth were rotten. The father also acknowledged the daughter's slow speech and her undeveloped vocabulary, but he testified that he did not see that as a problem. The mother confirmed that the daughter was not toilet trained when she entered DHR's custody; she stated that the daughter was wearing "pullups." The mother testified that she did not receive prenatal care during the first five months she was pregnant with the son.
The father admitted that the mother had stayed in a domestic-violence shelter on two occasions in 2000, although he denied that he had committed any physical abuse. The mother testified that there had been some domestic violence in the marriage before DHR intervened, but that, because of DHR's counseling, there had not been any violence in the house in the four years before the termination hearing.
The mother testified that after the son's birth, she tried to visit the son in the hospital every day, but that on some days she did not go because she did not have money for gasoline for her vehicle; the mother admitted that on those occasions she did not contact DHR about obtaining a ride to the hospital. The mother also claimed that cooking the father's supper and her own father's death while her son was in the hospital were reasons she did not visit the son in the hospital; the mother later testified that her father's death had nothing to do with the missed visits.
The mother testified that she was not working at the time of the hearing. According to the mother, she was overwhelmed by her former employment, which she said had caused her stress and *Page 671 
had kept her from working effectively. When asked what caused the stress, the mother testified, "I cannot recall right now." The mother testified that she had applied for Social Security disability based on her inability to deal with stress but that her claim was denied; the mother testified that she could have reapplied for Social Security benefits or appealed the decision. The mother stated that while stress prevents her from working outside the home, she is not affected by stress when she works with the children inside the home.
The mother attests that DHR's assistance has been very helpful and that it has prepared the parents for the possible return of the children. However, the mother testified that she would still need substantial assistance from DHR if the children were returned to her custody.
The grandmother testified that she was 49 years old at the time of the hearing; the parents live on the grandparents' property. The grandmother testified that she was the daughter's primary caretaker before DHR intervened. The grandmother testified that, before DHR took custody of the children, the daughter came to her house "shaking" on two occasions because the parents were arguing.
According to the father, he has never had a drinking problem; the father testified that he had not consumed an alcoholic beverage since the mother temporarily left him in late 2000. The grandmother originally testified that she had not had a drink since 1998; however, she later admitted that, in the spring of 2000, she had driven the mother to a DHR appointment after having consumed two alcoholic beverages and that she lied to the DHR personnel who questioned her about the smell of alcohol on her breath. The grandmother acknowledged that DHR had requested that she seek some form of treatment for alcohol dependency; however, the grandmother testified that she has never sought any form of treatment for alcohol dependency because a counselor told her it was not necessary. The father testified that the grandfather, while intoxicated, physically abused him once when he was six years old, but that the grandfather never drank alcohol after that incident.
The grandmother testified that she participated in the father's counseling sessions in order to understand the children's needs. The grandmother also met with the children's doctors on two occasions. The grandmother testified that she was familiar with the children's illnesses, including the son's asthma and his use of the breathing machine. However, the grandmother testified that she had not completed a CPR course as she was instructed to do by DHR.
The grandmother testified that the grandfather was disabled and that he has experienced a lack of energy caused by diabetes, but that he can work in his home workshop if the weather is nice. The grandmother was not employed at the time of the hearing, and she has a very limited work history. The grandmother testified that because she was in good health and does not work she would be able to care for the children if the grandfather was awarded custody.[2] The grandmother stated that she would not have any problem administering the children's medication because she had been administering the grandfather's medication for the past several years. The grandmother admitted on cross-examination that she and the grandfather have not been able to save any *Page 672 
money since the grandfather became disabled and that they have had to spend their personal savings.
The grandfather, who appeared pro se, took the stand on his own behalf. The grandfather admitted that he was depressed because of his disability and his loss of employment. The grandfather testified that he had seen a psychiatrist and that he was competent to serve as either the primary custodian of the children or as a secondary custodian if the parents were awarded custody.
Section 26-18-7, Ala. Code 1975, sets forth the statutory authority for the termination of a parent's parental rights; it provides:
 "(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for [the] needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
 "(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
 "(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
". . . .
 "(8) That parental rights to a sibling of the child have been involuntarily terminated.
 "(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
 "(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed *Page 673 
private child care agency, and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
This court has stated:
 "Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child. M.H.S. v. State Dep't of Human Resources, 636 So.2d 419 (Ala.Civ.App. 1994).
 "'The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala. Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala. Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26-18-7(b), Ala. Code 1975.'
"M.H.S. v. State Dep't of Human Resources, 636 So.2d at 421.
 "Where a nonparent petitions to terminate a parent's parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952
(Ala. 1990). The trial court must first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court's determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep't of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id."
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App. 1997).
The parents filed separate appeals. However, both parents make the same arguments in asserting that the trial court erred in terminating their parental rights. Therefore, we address those arguments together.
The parents argue that DHR did not present clear and convincing evidence justifying the trial court's termination of their parental rights. The trial court must consider instances of abuse and maltreatment of the children before terminating parental rights. § 26-18-7(a)(3), Ala. Code 1975. Channel contacted DHR based on the mother's allegation that the father "attack[ed]" her and tried to "choke" her and the daughter; there is evidence indicating *Page 674 
that the daughter suffered bruises and a black eye as a result of that altercation and that she missed several sessions at the center. Finally, the mother and father testified that the mother had resided in a domestic-abuse shelter for a period. There is also evidence indicating that the children were victims of maltreatment. While she was in the parents' custody, the daughter's teeth abscessed, but she had never been to a dentist. Channel testified that the daughter often came to school improperly clothed and with a diaper that was undersized and occasionally soiled. The testimony of the mother, the grandparents, and the DHR personnel indicated that the daughter's vocabulary was inadequate for her age. Finally, the mother testified that she did not receive prenatal care for the first five months she was pregnant with the son; the son experienced complications at birth and spent the first several months of his life in the neonatal intensive-care unit.
The trial court must also consider whether the parents have adjusted their circumstances to meet the needs of the children as determined by DHR. See § 26-18-7(b)(4), Ala. Code 1975. In this case, the trial court focused on the parents' inability to adjust their circumstances and to meet the responsibility involved with raising special-needs children. The trial court determined that the father's minimal income and the mother's inability to work resulted in a financial strain making it difficult to meet the children's medical requirements, which include the son's breathing machine and five doctor's appointments per month.
The trial court also determined that the parents lacked the emotional stability and mental capacity to provide for their special-needs children. Channel, Lane, Bonner, Lumpkin, and Terry, all qualified experts in child care, testified that the parents were not ready to care for their special-needs children and that they would not be ready in the foreseeable future. DHR personnel agreed that the parents had not made any long-term progress as a result of the parenting classes or the personal counseling. The fact that the parents thought that the weekly visitations with the children were too frequent was an indication to the DHR personnel that the parents were unprepared to have the children return to their home. The testimony established that the parents often lacked the proper concern for the children and had, on occasion, questioned their own ability to raise the children. Given the foregoing evidence, we cannot say that the trial court erred in determining that the parents had not adjusted their circumstances to meet the special needs of the children and in determining that the parents are "unable to properly care for the child[ren] and that such conduct or condition is unlikely to change in the foreseeable future." § 26-18-7(a), Ala. Code 1975; A.R.E. v. E.S.W., supra.
The parents also argue that the trial court erred when it determined that there were no viable alternatives to termination. See P.W. v.Alabama Dep't of Human Res., 822 So.2d 423 (Ala.Civ.App. 2001). The parents contend that the grandparents were not considered by DHR as a viable alternative.
The parents argue that DHR's one inspection of the grandparents' home and its alleged disregard of the grandfather's petition for custody is indicative of DHR's failure to consider the grandparents as a viable alternative to parental termination. However, the trial court received testimony from the grandfather and the grandmother, as well as DHR personnel. The evidence indicates that the DHR personnel did not provide the grandparents with any *Page 675 
specific training courses; however, the undisputed testimony established that the grandparents were invited to and did participate in the parents' training courses. DHR personnel evaluated the grandparents during those meetings. DHR's findings also indicated that the grandmother's care of the daughter may have contributed to the daughter's attachment disorder. Further, DHR requested that the grandmother attend an alcohol-abuse program, which she failed to do. Finally, the trial court was presented evidence of the grandparents' minimal income and inadequate housing and of the grandfather's poor health. Based on the facts presented to the trial court and the applicable standard of review, this court cannot say that the trial court improperly determined that the grandparents were not a viable alternative for the two special-needs children. See Ex parteBeasley, 564 So.2d 950 (Ala. 1990).
Given our standard of review and the evidence presented to the trial court, this court cannot say the trial court's determination was plainly and palpably wrong and, therefore, its determination must be presumed correct. M.H.S. v. State Dep't of Human Res., 636 So.2d 419
(Ala.Civ.App. 1994). Further, it is clear that the trial court's paramount consideration was the best interest of the children. See A.R.E.v. E.S.W., supra. The trial court's order terminating the parents' parental rights is affirmed.
AFFIRMED.
YATES, P.J., and CRAWLEY, PITTMAN, and MURDOCK, JJ., concur.
[1] Strickland testified that she has a degree in "human environmental sciences with a major in child development and a concentration in child life."
[2] It appears the grandmother intended to assist the grandfather if his petition for custody was granted.