986 So.2d 1172 (2007)
J.C.
v.
STATE DEPARTMENT OF HUMAN RESOURCES.
2060091.
Court of Civil Appeals of Alabama.
October 12, 2007.
*1173 Brandon C. Little, Cullman, for appellant.
Troy King, atty. gen., and Sharon E. Ficquette and Lynn S. Merrill, asst. attys. gen., Department of Human Resources, for appellee.
THOMPSON, Presiding Judge.[1]

Facts and Procedural History
On September 22, 2005, the Cullman County Department of Human Resources *1174 ("DHR") filed a petition to terminate the parental rights of J.C. ("the mother") and T.H. ("the father") to their daughter, G.M.H. (sometimes hereinafter referred to as "the child"). The mother answered, and the termination hearing was continued several times before the matter was heard on September 6, 2006. The juvenile court received ore tenus evidence, and on October 11, 2006, it entered a judgment terminating the parental rights of the mother and the father. The mother filed a timely appeal from the judgment. The father has not appealed.
The evidence presented at the termination hearing shows the following relevant facts, although none of the exhibits admitted into evidence at the hearing were made a part of the record on appeal. The mother has three children: C.R.C., C.C.B., and G.M.H. At the time of the hearing, C.R.C. was seven years old, C.C.B. was five years old, and G.M.H. was nearly three years old. Only the mother's rights as to G.M.H. are at issue in this appeal.
The mother testified that she was not sure who had legal custody of C.C.B., although she thought that the state of Mississippi might. It is undisputed that the mother's parental rights to C.C.B. were terminated by the state of Mississippi in 2003, while the mother was pregnant with G.M.H. The record does not indicate the circumstances leading to the termination of the mother's parental rights to C.C.B. The mother testified that in 2004 she was allowed to visit C.C.B. one hour each week.
The mother and the father both testified that they have extensive histories of illegal drug use. The mother testified that she has lived around illegal drugs all of her life and that she began using marijuana when she was 14 years old, at first periodically and eventually daily. She has also "tried" methamphetamine. When the mother met C.C.B.'s father, she began using methamphetamine four or five times each week. According to the mother, although she did not undergo any treatment, she stopped using drugs during each of her pregnancies.
The mother testified that she did not use drugs for about six months after C.C.B. was born. However, C.C.B.'s father left her, and she began using methamphetamine "to escape or when [she] had to get up and go to work." Her drug use escalated, and by the time she met the father in 2002, she was using methamphetamine every day. The record shows that at the time of the termination hearing the mother had been arrested at least twice for drug-related charges, but she had never been convicted of a felony.
The father testified that he began using marijuana when he was 15 years old;[2] he eventually used cocaine and methamphetamine. In 2000, the father made money by selling methamphetamine. Before he met the mother, the father either pleaded guilty to or was convicted of at least four felonies, including unlawful possession of controlled substances,[3] unlawful distribution of controlled substances,[4] forgery in the second degree,[5] and possession of burglar's tools.[6] Before he met the mother, the father had completed two drug-rehabilitation programs โ one court-ordered program *1175 and one while he was in prison. Although the father had been advised in the rehabilitation programs to attend support programs such as Narcotics Anonymous indefinitely after he completed the rehabilitation programs, he only did so for a few weeks. The father testified that, after the father was released from prison in 2001, he did not use drugs for approximately 10 months.
When the mother and the father met in 2002, the father was again using and selling illegal drugs. The relationship between the mother and the father was unstable. They would stop seeing one another because the mother objected to the father's drug use, and they would later reconcile based on the father's promises not to use drugs. The mother testified that, by the time of the termination hearing, she and the father had separated and reconciled more than four times.
The mother became pregnant with the child in the spring of 2003. The child was born six weeks premature in mid-December 2003. The mother was 20 years old when the child was born. The mother and the father testified that they were not working at the time the child was born and that, at that time, the father was not looking for work. Although the mother denied using illegal drugs while she was pregnant with the child, she also testified that she had used drugs in October 2003, just two months before the child was born.
Because she was born prematurely, the child remained in the hospital for two weeks after her birth. The father testified that he and the mother had visited her every day. On December 23, 2003, before the child was released from the hospital, the mother was arrested for possession of a controlled substance. That charge was still pending at the time of the termination hearing because the mother had entered into an agreement under which prosecution was deferred while the mother participated in a substance-abuse treatment program.[7]
The child was released from the hospital on December 29, 2003. The father testified that she was healthy and that he and the mother did not receive special instructions regarding her care. Just a few hours after the child arrived home, police officers executed a search warrant related to a third party whose belongings were at the parents' home. The father testified that, without the mother's knowledge, he had illegal drugs in his pocket at the time of the search. When the officers discovered the father's drugs, they arrested him for unlawful possession of a controlled substance. After the father was released on bond in January 2004, the mother, C.R.C., and the child continued to live with him.
In January 2004, DHR contacted the mother's family in an attempt to locate C.R.C. and the child. When the mother's family told her that DHR was looking for the children, the mother hid them for two to three weeks. The father testified that he and the mother voluntarily surrendered custody of the children to DHR on February 2, 2004.
A hearing was held, and the child, who was then seven weeks old, was determined to be dependent and placed in DHR's custody. The record does not show the factual or legal bases of the dependency determination. The child was placed with a *1176 foster mother, P.J.A. ("the foster mother"), who cared for her until the time of the termination hearing nearly three years later. C.R.C. was also placed with the foster mother; however, the record does not show who had legal custody of him at the time of the termination hearing.
A senior social worker with DHR, Jennifer Jackson, testified that she had been the child's caseworker since the child was determined to be dependent. The mother and the father met with Jackson and the foster mother shortly after the dependency hearing to develop an Individualized Service Plan ("ISP"). According to Jackson, the ISP identified goals that the mother and the father were to satisfy in order to be reunited with the children. The parents testified that, pursuant to the ISP, they were to maintain a stable home, work to become able to support the children financially, and stay "drug free." Jackson testified that they were also to address the pending criminal charges against them. The juvenile court ordered that the mother and the father have supervised visitation with the child once each week. Jackson testified that visitation was an essential part of the ISP and the reunification process.
The evidence regarding the father's failure to meet the goals established by the ISP is undisputed. The father and mother married in February 2004, and thereafter the father worked performing freelance carpentry for two to three months. However, in June 2004, the mother and the father separated because of the father's use of methamphetamine. The mother and the father saw each other occasionally, but they did not reconcile until June 2005. The father moved frequently because he did not have a stable job. He testified that he never visited the child or communicated with DHR about receiving custody of her. Jackson testified that DHR had an "indicated" report from another county against the father regarding abuse and neglect and that the report influenced DHR's decision not to return the children to the father's home.
On February 28, 2005, the father pleaded guilty to unlawful possession of a controlled substance and was ordered to spend 12 months in an inpatient drug-rehabilitation program. At the time of the September 6, 2006, termination hearing, the father had not complied with the February 28, 2005, order. The father testified that he understood that he had up to five years to comply with the order and that he did not know how to enter such a program.
The evidence was largely disputed regarding the mother's actions after the child was determined to be dependent. As part of the deferred prosecution of the mother's December 23, 2003, possession charge, she participated in the North Central Alabama Substance Abuse Counsel Court Referral Program ("CRP"). The mother stated that she had participated in the CRP for two years and had reported for drug tests that had cost her $20 each week. The mother testified that DHR never helped her enter a drug-treatment or rehabilitation program. Instead, she said, DHR just told her she had to "stay clean." Jackson testified that, at the time of the initial ISP meeting, the mother was already involved with CRP and DHR advised her to complete the program and comply with the drug tests.
Cindy Keller, a court referral officer ("CRO") for the CRP, testified that most participants complete the program after six months or a year. The mother still had not completed the program after three or more years. According to Keller, the mother had started with CRP in April 2004, or possibly earlier; one CRP record relating to the mother was dated October 2003. Keller confirmed that the mother *1177 had been referred to the program by the courts, stating: "It was a child custody. Then we got her on a deferred prosecution."
The CRP required the mother to submit to random drug tests, and its records showed that she had not failed any test to which she had submitted. However, Keller testified that the reason the mother had not completed the program in three years was because she had frequently failed to submit to drug tests and to comply with other program requirements. When the mother would fail to comply for a number of weeks and the CROs could not contact her, they would dismiss her from the program and refer her back to the court that had handled her criminal case. Eventually, the mother would be referred back to the CRP, and the pattern would repeat itself. The mother testified that she did not know if she had ever been referred to the court for failing to comply with the CRP requirements.
As one of the ISP goals, DHR had asked the mother to find work so that she could earn enough to support herself and the child. After February 2004, the mother found work, but she voluntarily quit after three or four months because she "really didn't like it." The mother then ran out of money and began working with a cleaning service two to three days each week, but she did not earn enough money to support herself and the child. After two months, the mother quit that job because, according to the mother, she did not have transportation and was too busy visiting C.R.C. and the child, visiting C.C.B. in Mississippi, and complying with the CRP requirements.
The mother testified that she was using drugs during that time. She stated that she did not find another job because she was arrested for unlawful possession of a controlled substance in November 2004 and was jailed for three weeks after her arrest. Although the evidence did not show the disposition of this charge, the mother testified that, other than the December 23, 2003, possession charge, no other charges were pending against her.
In November 2004, the CRP referred the mother to an inpatient rehabilitation program known as "A Woman's Place" for 30 days. The mother stayed at A Woman's Place for the full 30 days and was released in December 2004. The mother testified that while she was at A Woman's Place she learned about the addiction process and the importance of post-rehabilitation support. The mother stated that she subsequently attended Narcotics Anonymous meetings for a month, until January 2005.
The evidence conflicted regarding whether DHR had provided sufficient assistance to the mother. The mother testified that DHR did not help her find housing, employment, or transportation. She stated that she had requested transportation vouchers from DHR but never received them. The mother testified that she believed DHR should have forced her to submit to a rehabilitation program when the child was first removed from her care.
Jackson testified that DHR helped the mother and tried to reunite her with the child. DHR helped the mother obtain her general equivalency diploma ("GED") so that she could attend college or obtain a job. DHR referred her to an organization that helped her with family support and visitation services. Jackson testified that the reason DHR did not help the mother into a drug-rehabilitation program was because she was already participating in the CRP. DHR paid for the mother's drug tests when she could not afford them. The mother confirmed that DHR had helped her obtain her GED and had provided transportation so that she could visit with *1178 C.R.C. and the child. She also attended parenting classes twice after the child was removed from her custody.
The mother testified that after she was released from A Woman's Place in December 2004, she began attending classes full time so that she could work toward a degree "in the medical field." She stated that DHR had approved of her educational plans. The mother completed two semesters of school before she stopped attending.
The mother's testimony conflicted with the foster mother's regarding her ability to contact the child. The mother testified that she was not allowed to have the foster mother's telephone number for a year after C.R.C. and the child were removed from her custody. The mother stated that the children could call her at designated times, but the child was too young to talk. According to the mother, the foster mother gave her a cellular telephone and told her that she could call to check on the children; however, the mother could not afford to activate the cellular telephone.
In contrast, the foster mother testified that she gave the mother her telephone number at the first ISP meeting and told her that she could call the children any time she wanted. When the foster mother later asked the mother why she did not call, the mother replied that she did not have a telephone. In the summer of 2004, the foster mother purchased a prepaid cellular telephone, had useable time put on it, and gave it to the mother. However, the mother never called the children from that cellular telephone. The foster mother testified that, in the three years the child was in her care, the mother had called 8 to 10 times.
The evidence conflicted significantly regarding the mother's visitation with the child between February 2004 and March 2005. The foster mother testified that, at the first ISP meeting, "I told [the mother] she was welcome at my home any time as long as she wasn't drinking or under the influence of drugs. That if she could call ahead of time, she could come any time she wanted to see [the children]." The foster mother stated that she did not limit the time the mother could spend with the child at her home. The mother visited the child at the foster mother's home twice: on Christmas Day 2004, for 2ฝ hours, and before a supervised visitation, for about 30 minutes. The foster mother stated that she had asked the mother why she did not visit the child more and that the mother had responded that she did not have money. The foster mother also stated that, other than Christmas 2004, the child never received gifts or cards from the mother and that, although they had the opportunity, no other family members had visited the child.
Supervised visitation was scheduled to take place once each week at DHR's offices. The mother testified that she took full advantage of all the visitation allowed her and that she missed visitation only when she was in jail in November 2004, when she was at A Woman's Place, and once when she had a virus. Other than that, she stated, she could not recall a time when she had failed to visit the child.
Sherry Trollinger, a family services counselor, supervised the mother's visits with the child. She testified that the mother had visited the child regularly for a time and that her behavior had been appropriate. Trollinger observed, though, that the child seemed more attached to the foster mother. Jackson testified that the mother's visits with the child had progressed well and that DHR had soon requested that she be allowed additional visitation in "more normal" settings. Eventually, the mother was allowed to have unsupervised and day-long visits *1179 with C.R.C. and the child. Jackson testified that in February 2005 DHR had planned to allow the mother to have overnight visits on the weekend. However, the mother stopped visiting the child in late March 2005. The evidence is disputed as to why the mother stopped visiting the child.
According to the mother, DHR terminated her visitation with the child and, at the time, she did not know why. The mother said that Jackson later told her that visitation had been terminated because she had missed several visits with the child. To the contrary, Jackson testified that at the end of February 2005 the mother had tested positive for the drug propoxyphene and had been "pulled over with drug paraphernalia in her car." The mother denied ever having a positive drug test. DHR did not present any evidence to the juvenile court showing the precise nature of the drug propoxyphene. Because of the positive drug test, DHR required that the mother's visits with the child be supervised again.
When Trollinger again began supervising the mother's visits with the child pursuant to DHR's order, she reported that the mother began falling asleep during some visits and that "most of the time her visits didn't take place." The mother denied missing visits or sleeping during visits with the child. Jackson stated that she had told the mother that DHR would require a negative drug test before she could visit with the child again. It is unclear from the record whether DHR required that the mother have supervised visits until she had a negative drug test or whether it required a negative drug test before the mother could visit the child at all.
It is undisputed that the mother did not visit or communicate with the child from March to November 2005. The mother did not maintain contact with DHR or the foster mother, did not ask for updates on the child's well-being, and did not request visitation. During that time, DHR did not know the whereabouts of either parent.
On March 16, 2005, the mother was dismissed from the CRP for failing to attend meetings and to comply with other program requirements. The mother was reinstated to the CRP in April 2005, but she was dismissed from the program again on June 16, 2005, for failing to comply with program requirements. The mother and father reconciled in June 2005.
Jackson made several unsuccessful attempts to contact the mother between March and September 2005. The CRP advised Jackson that it had referred the mother back to the court. Jackson attempted to find alternative resources to care for the child. She contacted each person on a list of possible family resources as well as other family members. Most asserted no interest in helping the child. Jackson stated that those individuals who were interested in helping the child either had criminal backgrounds or histories of illegal drug use. The record showed that DHR had received a letter from C.R.C.'s paternal grandmother, M.S., who was not a direct blood relative of G.M.H., but who offered herself as "a resource." The record does not demonstrate why DHR did not ultimately consider M.S. a viable alternative for placement of the child.
Jackson stated that she did consider the mother's sister, M.B., and the father's mother, J.M.T., as possible resources for placement. Jackson attempted to contact M.B. to see if she would be willing to care for the child. Although Jackson left messages with M.B. regarding the purpose of her calls, and although M.B. promised to respond, Jackson never heard back from M.B. Jackson stated regarding M.B., "I can't force someone to participate."
*1180 The evidence regarding J.M.T. conflicted. According to J.M.T., she attended the first ISP meeting and identified herself as a resource. She stated that she waited to hear back from Jackson, but never did. J.M.T. admitted that she never contacted DHR, even after she learned of the termination petition. J.M.T. worked 32 hours each week and stated that the child would be cared for by her husband while she was at work. J.M.T. testified that her husband had health problems and could not lift more than 39 pounds but that he could care for the child in her absence.
Jackson stated that she had considered J.M.T. but that she had excluded her as a viable alternative resource for placement for several reasons. Jackson stated that because of J.M.T.'s work schedule and the fact that J.M.T. was caring for a sick husband, she was concerned about J.M.T.'s ability to care for the child. Additionally, DHR had records of at least four or five "indicated" reports against J.M.T. from when the father was a child. Those reports showed neglect, domestic violence, and that J.M.T. had locked a child out of her home. J.M.T. denied ever being investigated or reported by DHR. Jackson testified that, because of those reports, DHR decided not to consider J.M.T. as a resource for placement.
Jackson stated that there was no viable alternative resource to care for the child. After no alternative resource could be found, after DHR had received no contact from the mother for six months, and after attempts to locate the mother and the father had failed, DHR decided to file a petition to terminate the parents' rights. Jackson testified that the decision was based in part on a policy that requires DHR to file a petition for termination of parental rights if a child is in its care for 15 out of 22 months.[8] DHR had had legal custody of the child continually for more than 19 months when DHR filed the petition to terminate the parents' parental rights on September 22, 2005.
The mother answered the petition on October 4, 2005. In November 2005, she contacted Jackson to ask about the child. When Jackson inquired of the mother as to why she had not maintained contact with DHR, the mother responded that "she had to get her stuff together, she had to do what she had to do to get her stuff together." In December 2005, the mother requested visitation with the child.
DHR required the mother to pass a hair-follicle drug test before it allowed her to visit the child. Jackson testified: "The premise of it was we need to make sure that they are clean before visitation." The mother told DHR that she would not take a drug test until she was allowed to visit the child. The mother eventually took the test in July 2006. The test showed that she had not used drugs during the preceding three months. DHR then allowed the mother to visit the child.
The mother visited the child twice between July 2006 and the September 2006 termination hearing. The father testified that during the 14 months before the hearing, DHR had decided when he and the mother could visit. Jackson testified that *1181 the parents were not allowed to visit the child in the months before the hearing because DHR had not "had communication with [the parents], to work with them," and because DHR did not allow progressive visits after it had filed a petition to terminate.
The mother and the father testified that their relationship had stabilized and that they had not separated since they had reconciled in June 2005. The parents resided together at the time of the termination hearing and had moved to Colbert County 10 months before. The parents rent a house in Colbert County. A home study performed by that county's Department of Human Resources found the house structurally stable and appropriate for children. Jackson also performed a home study for DHR. She testified that the home was appropriate and safe structurally; however, she was concerned with the parents' personal histories of drug use.
The father testified that he had had three jobs during the year before the termination hearing and that he had never been unemployed. At the time of the hearing, the father worked at a truck stop pumping gas and doing some mechanic work. At the time of the termination hearing, the father was on probation and would be for four more years. The mother testified that since November 2005 she had worked as a waitress approximately 36 hours each week. The father testified that he and the mother have a 1996 Jeep Grand Cherokee and a 1978 Ford Courier truck that they use for transportation to their jobs. The mother stated that she felt she and the father were financially able to care for the child. Jackson testified that she did not believe the parents were financially stable because the father had $30,000 in unpaid criminal fines and the mother had $1,500 in unpaid criminal fines. The mother did not provide any financial assistance to the child even though she testified that she could have. However, she stated that DHR had never asked her to provide support for the child.
The father testified that he had not used drugs for the 12 months before the termination hearing and that he had had no positive drug tests for the last 14 months. The father stated that he had been able to stop using drugs because he had moved away from the people he knew in Cullman County. The mother testified that she has consistently taken drug tests two to three times each month through the CRP and has never had a positive drug test. She understood that if she maintained negative drug tests for two months after the termination hearing, the criminal charge against her would be dismissed. The mother stated that she had no mental or physical problems that would affect her ability to care for the child.
The mother last attended a Narcotics Anonymous meeting in January 2006. At the time of the termination hearing, neither she nor the father was attending any type of substance-abuse support program. The mother stated that she handled her drug problem by complying with the CRP's requirements and by working with its counselors. The mother and the father stated that they attend church.
At the time of the hearing, the child had bonded well with the foster mother, who had cared for her for nearly all of her three years of life. Although the child had visited with the mother, she had never lived with the parents. Jackson testified that the child did not know who the parents were and had not developed a bond with them. The foster mother testified that, although the child was born prematurely, by the time of the termination hearing her health was good and she was learning above the normal scale. Jackson testified that she believed the child would *1182 be adoptable if the parents' rights were terminated. Jackson identified the foster mother as a resource for adoption.
Jackson testified that she had reviewed the list of possible resources again two weeks before the termination hearing to make certain that DHR could not locate an appropriate alternative family resource. Jackson stated that she had confirmed that no viable alternative resource existed.
Jackson testified at the termination hearing that she still believed that termination of the parents' rights was in the best interest of the child and that termination was the least restrictive alternative and would give the child permanency. The child's guardian ad litem also recommended that the parents' rights be terminated because no viable family resource had been identified and the parents had a history of returning to drugs after periods of stability.
On October 11, 2006, the trial court entered a written judgment terminating the parents' rights to the child. The judgment contained written findings of fact that the trial court expressly stated were "based upon clear and convincing evidence." The judgment stated, in relevant part:
"4. The court finds that the minor child, [G.M.H.], is dependent.
"5. The court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of [the child] are unable or unwilling to discharge their responsibilities to and for the child or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future.
"6. The court finds that parental rights to a sibling of [the child] have been involuntarily terminated. [The mother] is the mother of that child and this evidence has not been considered against [the father], who was not the father of that child.
"7. The court further finds that the mother and father of the minor child have failed to provide for the material needs of the child or to pay a reasonable portion of her support even though they are able to do so.
"8. The court further finds that the father and mother of the minor child have failed to maintain consistent contact or communication with the minor child.
"9. The court finds that the father and mother have exposed the child to a home environment that is unstable, neglectful and that is not suitable to raise a child.
"10. The mother and father have an extensive history of excessive use of controlled substances of such duration or nature as to render them unable to care for the needs of the minor child. The court notes that the father and mother have made some recent efforts to remain drug free since the filing of the petition to terminate parental rights. However, the court also notes that this recent period of drug abstinence follows an all too familiar pattern. The testimony adduced at trial demonstrates that on many previous occasions the parents have also remained drug free for short periods of time only to resume their long-standing pattern of drug abuse.
"11. The court further finds that the father of the minor child has been previously convicted of at least one felony.
"12. [DHR] has exhausted all less restrictive alternatives to termination of parental rights and the court finds that there does not exist any alternative less drastic than termination of parental *1183 rights available that would serve the best interest of the said minor child.
"13. The court expressly finds that [DHR] has used diligence to explore other resources for placement of the minor child. The court finds that placement of the minor child with relatives or some other resource is not a viable alternative to termination of parental rights since no appropriate resources exist for either temporary or permanent custody that would be in the best interest of the minor child.
"14. Reasonable efforts of [DHR] to rehabilitate the mother and father of the minor child have failed and the court finds that it is not in the best interest of the minor child to be returned on a temporary or permanent basis to the mother or the father. The court further finds that the minor child is highly adoptable."

Standard of Appellate Review
This court's standard of appellate review of judgments terminating parental rights is well-settled. A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep't of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007).[9] Under express direction from our supreme court, in termination-of-parental-rights cases this court is "required to apply a presumption of correctness to the trial court's finding[s]" when the trial court bases its decision on conflicting ore tenus evidence. Ex parte State Dep't of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court's judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.
The ore tenus rule, a standard of appellate review, is distinct from the clear-and-convincing-evidence standard of proof that Alabama juvenile courts have long used in determining whether to terminate parental rights. See, e.g., งง 12-15-65(f) and 26-18-7(a), Ala.Code 1975; and B.M. v. State, 895 So.2d 319, 330-31 (Ala.Civ.App.2004). In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court held that a New York statute that authorized trial courts of that state to terminate parental rights based on a "fair preponderance of the evidence" standard of proof violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. 455 U.S. at 768, 102 S.Ct. 1388. As part of its analysis, the Supreme Court noted that Alabama was among the majority of states that required trial courts to use the clear-and-convincing-evidence standard of proof in deciding whether to terminate parental rights. 455 U.S. at 749 n. 3, 102 S.Ct. 1388 (citing Dale County *1184 Dep't of Pensions & Sec. v. Robles, 368 So.2d 39, 42 (Ala.Civ.App.1979)).
This court has stated that clear and convincing evidence is
"`[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'
"ง 6-11-20[(b)] (4), Ala.Code 1975."
L.M. v. D.D.F., 840 So.2d 171, 179 (Ala. Civ.App.2002) (emphasis added). That description of clear and convincing evidence presumes that the clear-and-convincing-evidence standard is a standard of proof to be utilized by a jury or a trial court, i.e., a trier of fact, in weighing evidence, not a standard of review to be used by an appellate court. As the Supreme Court explained in Santosky:
"`The function of a standard of proof... is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."'"
Santosky, 455 U.S. at 754-55, 102 S.Ct. 1388 (quoting Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), quoting in turn In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)) (emphasis added).
The Alabama Supreme Court has stated that "the law is settled that weighing evidence is not the usual function of an appellate court. This is especially true where... the assessment of the credibility of witnesses is involved." Knight v. Beverly Health Care Bay Manor Health Care Ctr., 820 So.2d 92, 102 (Ala.2001) (citation omitted). Accordingly, appellate courts in this state generally do not review evidence in order to make factual conclusions; instead, they review judgments in order to determine whether the trial court committed reversible error. Because our appellate courts do not act as fact-finders, they do not utilize standards of proof but, instead, apply standards of appellate review.
Standards of proof utilized by trial courts in weighing evidence and standards of review applied by appellate courts in reviewing judgments are necessarily different. The United States Supreme Court explained this difference in Woodby v. Immigration & Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). Although Judge Moore quotes from the Supreme Court's explanation in Woodby in his special writing, he quotes only a portion of the following excerpt:
"The elementary but crucial difference between burden of proof and scope of review is, of course, a commonplace in the law. The difference is most graphically illustrated in a criminal case. There the prosecution is generally required to prove the elements of the offense beyond a reasonable doubt. But if the correct burden of proof was imposed at the trial, judicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment. In other words, an appellate court in a criminal case ordinarily does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt, but whether the judgment is supported by substantial evidence."
*1185 385 U.S. at 282, 87 S.Ct. 483 (footnotes omitted).
Like the example in Woodby, in cases involving the termination of parental rights our appellate courts do not apply the clear-and-convincing-evidence standard of proof utilized by trial courts but, instead, use a settled standard of appellate review โ the ore tenus rule. See Ex parte State Dep't of Human Res., 834 So.2d at 122.[10] Because appellate courts do not weigh evidence, particularly when "the assessment of the credibility of witnesses is involved," Knight, 820 So.2d at 102, we defer to the trial court's factual findings. "The ore tenus rule reflects this deference; it accords a presumption of correctness to the trial court's findings because of that court's unique ability to observe the demeanor of witnesses." Id.; see also Fitzgerald v. Jeter, 428 So.2d 84, 85 (Ala.Civ. App.1983), and Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
Judge Moore argues in his special writing that our appellate courts should not afford such deference to juvenile courts' findings of fact in cases involving the termination of parental rights. This court considered and rejected this argument 20 years ago in Columbus v. State Department of Human Resources, 523 So.2d 419 (Ala.Civ.App.1987), a case Judge Moore cites for its supposed "irony." In Columbus, a case involving the termination of parental rights, this court stated:
"The mother contends that the ore tenus rule should not be applied when determining whether parental rights should be terminated. We do not find merit in this argument. The ore tenus rule is merely a standard of review that the appellate courts use to review factual determinations of the trial court and not the burden of persuasion. The burden of proof required is clear and convincing evidence as mandated by statute in Alabama. See, งง 12-15-65(e) and 26-18-7(a), [Ala.] Code 1975. The appellate court must find, within the record, sufficient evidence that is clear and convincing in order to affirm."
523 So.2d at 421. As this court did in Columbus, we again reject the argument that the ore tenus rule does not apply in cases involving the termination of parental rights.
We do not believe, as Judge Moore argues, that Santosky requires a different standard of appellate review or that the ore tenus rule undermines the safeguards of the clear-and-convincing-evidence standard of proof. The Supreme Court's decision in Santosky addressed only whether the "fair preponderance of the evidence" standard of proof utilized by New York trial courts violated parents' due-process rights. See Santosky, supra. It did not speak to the proper standard of appellate review; in fact, it cited with approval an Alabama case in which this court deferred to the trial court's factual findings because the decision was based on ore tenus evidence. Santosky, 455 U.S. at 749 n. 3, 102 S.Ct. 1388 (citing Dale County Dep't of Pensions & Sec. v. Robles, 368 So.2d at 42).[11]
Additionally, when properly applied, the ore tenus rule does not undermine the function of the clear-and-convincing-evidence standard of proof. Rather, the ore tenus rule affords a correct and necessary deference to the trial court's factual findings, recognizing that an appellate court sees only a written record and does not *1186 observe the appearance, behavior, and demeanor of live witnesses. The ore tenus rule simultaneously requires the appellate court to review the trial court's judgment to determine if it is supported by the appropriate level of evidence. The rule thus preserves the safeguards of the standard of proof that was utilized by the trial court without improperly usurping the trial court's role as fact-finder. Consequently, in several areas of the law, our appellate courts apply the ore tenus rule when reviewing judgments in which the trial court has utilized the clear-and-convincing-evidence standard of proof. See, e.g., Knight, 820 So.2d at 102 (review of a denial of request to enjoin a nursing home from removing a patient's feeding tube); Henderson v. Dunn, 871 So.2d 807, 810 (Ala.Civ.App.2001) (review of a judgment granting title based on adverse possession); Gray v. Bush, 835 So.2d 192, 194 (Ala.Civ.App.2001) (recognizing that the ore tenus rule applied to appellate review of a judgment determining that a common-law marriage existed); Herbert v. Haggermaker, 53 Ala.App. 15, 19, 296 So.2d 915, 917-18 (Ala.Civ.App.1974) (review of judgment determining that a decedent had not made an inter vivos gift); and Bastian-Blessing Co. v. Gewin, 217 Ala. 592, 117 So. 197 (1928) (review of a judgment granting a petition for relief from a judicial decree).
Accordingly, as this court did in Columbus, 523 So.2d at 421, and based on the authority of Ex parte State Department of Human Resources, 834 So.2d at 122, we reject Judge Moore's argument regarding the appropriate standard of appellate review. We will, therefore, presume that the trial court's factual findings in this case were correct, and we will not reverse the trial court's judgment unless the record demonstrates that the judgment is not supported by clear and convincing evidence.

Settled Law Regarding the Termination of Parental Rights
The law governing the termination of parental rights is well-settled. Where, as here, the petitioner is a nonparent, our courts use a two-pronged test to determine whether to terminate parental rights:
"A juvenile court is required to apply a two-pronged test in determining whether to terminate parental rights: (1) clear and convincing evidence must support a finding that the child is dependent; and (2) the court must properly consider and reject all viable alternatives to a termination of parental rights. Ex parte Beasley, 564 So.2d 950, [954] (Ala.1990)."
B.M., 895 So.2d at 331. Alabama courts have applied these two factors to termination-of-parental-rights cases since at least 1978.[12]
In 1984, our legislature enacted the 1984 Child Protection Act ("CPA"), งง 26-18-1 to 26-18-11, Ala.Code 1975.[13] In ง 26-18-2, the legislature stated the purposes of the CPA as follows:

*1187 "It is the purpose of this chapter to provide meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights in such a manner as to protect the welfare of children by providing stability and continuity in their lives, and at the same time to protect the rights of their parents."
(Emphasis added.) Section 26-18-7 of the CPA provides:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child....
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for the needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources ... leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of [certain crimes.]
"....
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent ..., the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department ... and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or *1188 licensed child-placing agencies, in an administrative review or a judicial review."
Soon after the CPA was enacted, and consistently thereafter, our courts have utilized the two-pronged test, applying the provisions of ง 26-18-7 as "meaningful guidelines" pursuant to ง 26-18-2. See Brown v. Alabama Dep't of Pensions & Sec., 473 So.2d 533 (Ala.Civ.App.1985) and Clemons v. Alabama Dep't of Pensions & Sec., 474 So.2d 1143 (Ala.Civ.App.1985).[14]
Section 26-18-4 of the CPA states that, "[u]nless otherwise provided herein, proceedings to terminate parental rights shall be governed by Title 12, Chapter 15, Article 3 and by the Alabama Rules of Juvenile Procedure," which governed termination-of-parental-rights proceedings before the CPA was enacted. Accordingly, in Brown, 473 So.2d at 534-35, this court stated:
"Under this act, proceedings to terminate parental rights are to be conducted much as they had been prior to the passage of the act in accordance with juvenile court procedures provided by งง 12-15-50 to -76, Code 1975. See ง 26-18-4, Code of Alabama 1975.
"....
"The [CPA] enumerates only some of the many factors this court has long taken into consideration in making determinations concerning the termination of parental rights. Among the factors we have emphasized are the conduct of the parents toward the child, the parent's love or interest in the child, activities of the parents that could be detrimental to the safety and welfare of the child, and whether there are less drastic alternatives available than the permanent removal of parental custody. Miller v. Alabama Department of Pensions and Security, 374 So.2d 1370 (Ala.Civ. App.1979). See Glover v. Alabama Department of Pensions Security, 401 So.2d 786 (Ala.Civ.App.1981)."
Regarding ง 26-18-7 of the CPA, in Clemons, 474 So.2d at 1145, decided nearly two months after Brown, this court stated:
"It is important to note two things about this section. First, the factors listed are nonexclusive, so that a court may also consider any other factors that are relevant to the child's welfare. Brown v. Alabama Department of Pensions and Security, 473 So.2d 533 (Ala. Civ.App.1985). Second, the section is actually a codification of only one of the possible grounds upon which a court may find a child dependent, and thus in need of an order concerning his welfare. The legislation is not intended to restrict such a determination of dependency to the circumstance in which the parents are unwilling or unable to discharge their responsibilities. See งง 26-18-4, -7, Code of Alabama 1975; Brown v. Alabama Department of Pensions and Security, supra. As such, the basic principles for consideration for a parental rights termination case are not changed."
The court in Clemons then applied the two-pronged test stated above.
In 1990, our supreme court decided whether the dependency requirement of the two-pronged test applied to all termination-of-parental-rights cases or only to those cases in which a nonparent seeks the termination of parental rights. Ex parte Beasley, 564 So.2d 950 (Ala.1990). The supreme court held that the dependency requirement applied in cases in which a nonparent seeks termination but that the CPA does not require a parent seeking to terminate the rights of the other parent to prove dependency. 564 So.2d at 954. *1189 Recognizing that the CPA did not expressly require a finding of dependency, the supreme court noted that the two-pronged test was drawn, in part, "from ง 12-15-1 et seq. ('the Juvenile Act') and Rule 25, [Ala.] R. Juv. P." 564 So.2d at 953. Pursuant to ง 26-18-4, the legislature did not intend the CPA and the Juvenile Act to be mutually exclusive. Accordingly, regarding the two-pronged test, the supreme court in Beasley stated:
"The Juvenile Act and Rule 25, implicitly, though necessarily, speak in the context of the State's (or a nonparent's) petitioning for a termination of parental rights. The[] holdings [in the Court of Civil Appeals' cases that set forth the two-prong test] are not incorrect in light of the context in which they were decided....
"....
"... [A] distinction must be drawn between the State's seeking to terminate parental rights and a parent's seeking to terminate the other parent's parental rights. Where the State seeks to terminate parental rights, the `finding of dependency' necessarily applies to the State to protect against an unwarranted intrusion into parental rights and to comply with the requirements of due process. Parental rights are indeed cherished and deserve the law's utmost protection against unwarranted interference.
"In viewing the `dependency' issue in the context of the State's attempt to terminate parental rights, the State would have standing only where both parents are found to be unfit or otherwise unable to discharge the responsibilities of parenthood. Therefore, a finding of `dependency' would be warranted, and the State would have a duty to act in accordance with that child's best interest.
"....
"... (As earlier discussed, if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)"
564 So.2d at 953-54 (first emphasis in original; other emphasis added).
Because the issue in Beasley was whether the dependency requirement of the two-pronged test applies in all termination-of-parental-rights cases or only in those cases in which a nonparent seeks a termination of parental rights, we do not believe, as Judge Moore asserts in his special writing, that the supreme court's analysis regarding the application of the dependency prong in cases involving nonparents is dicta. However, even if the statement of the two-pronged test in Beasley were dicta, the test was subsequently adopted by our supreme court and is, therefore, binding precedent. See, e.g., Ex parte J.R., 896 So.2d 416, 423 (Ala.2004); Ex parte State Dep't of Human Res., 890 So.2d 114, 116-17 (Ala.2004); and Ex parte State Dep't of Human Res., 624 So.2d 589, 592-93 (Ala. 1993). We are bound by the supreme court's holding in Beasley and its progeny, and we agree with its reasoning.
The two-pronged test, which applies when the state seeks to terminate parental rights, ensures that the minimum requirements of due process and standing are satisfied before a court can terminate a parent's rights. See, e.g., T.S. v. J.P., 674 So.2d 535, 537 (Ala.Civ.App.1995). "The right to parent one's child is a fundamental right, and the termination of that right should occur `"only in the most egregious of circumstances."' L.M. v. D.D.F., 840 So.2d 171, 172 (Ala.Civ.App.2002) (quoting Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990))." K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003). Our courts must at least begin by determining that the child is *1190 dependent upon the state; otherwise, the state's interest in the child could not be sufficient to overcome the parent's fundamental rights. The dependency requirement, therefore, is a minimum threshold that ensures that the state has standing to pursue termination of parental rights and that the parent's due-process rights are not violated. See Beasley, 564 So.2d at 954. We therefore disagree with Judge Moore's assertion that the state need not show evidence of dependency before a parent's rights may be terminated.
Additionally, our courts must consider whether viable alternatives to termination of parental rights exist. See, e.g., Columbus, 523 So.2d at 420; Clemons, 474 So.2d at 1145; Shivers v. State Dep't of Pensions & Sec., 440 So.2d 1081, 1083-84, (Ala.Civ. App.1983); Glover v. Alabama Dep't of Pensions & Sec., 401 So.2d 786, 789 (Ala. Civ.App.1981); Miller v. Alabama Dep't of Pensions & Sec., 374 So.2d 1370, 1374 (Ala.Civ.App.1979); and Lovell v. Department of Pensions & Sec., 356 So.2d 188, 190 (Ala.Civ.App.1978). To hold otherwise would allow our courts to terminate parental rights when viable alternatives to termination exist and thus, we believe, violate the parents' due-process rights. "`The termination of parental rights is a drastic measure, and the courts gravely consider such action.' K.A.C. v. Jefferson County Dep't of Human Res., 744 So.2d 938, 940 (Ala.Civ.App.1999) (citing Ex parte Beasley, 564 So.2d 950 (Ala.1990))." B.G. v. State Dep't of Human Res., 875 So.2d 305, 307 (Ala.Civ.App.2003). Accordingly, the viable-alternative requirement of the two-pronged test is likewise necessary in termination-of-parental-rights cases.
After Beasley was decided, Alabama courts consistently applied the two-pronged test, using the provisions of ง 26-18-7 as "meaningful guidelines" in their analyses.[15] Our legislature has amended the CPA twice since the supreme court's holding in Beasley. In 1997, the legislature amended งง 26-18-6 and 26-18-7, and in 1998, it amended งง 26-18-5 and 26-18-7 and added ง 26-18-11, "without altering the effect of [Beasley and its progeny]." Ex parte HealthSouth Corp., 851 So.2d 33, 41 (Ala.2002).
"`It is an ingrained principle of statutory construction that "[t]he Legislature is presumed to be aware of existing law and judicial interpretation when it adopts a statute. Ex parte Louisville & N.R.R., 398 So.2d 291, 296 (Ala.1981)."' Ex parte Fontaine Trailer Co., 854 So.2d 71, 83 (Ala.2003) (quoting Carson v. City of Prichard, 709 So.2d 1199, 1206 (Ala.1998)). In adopting statutes and amendments thereto `"`the Legislature is presumed to have known the fixed judicial construction preexisting statutes had received, and the substantial re-enactment of such statutes is a legislative adoption of that construction.'"' Ex parte Fontaine Trailer Co., 854 So.2d at 83 (quoting Wood-Dickerson Supply Co. v. Cocciola, 153 Ala. 555, 557, 45 So. 192, 192 (1907), quoting in turn Morrison v. Stevenson, 69 Ala. 448, 450 (1881)). `[W]here a statute is reenacted without material change, "it must be assumed that the Legislature was familiar with its interpretation by [the supreme] court and was satisfied therewith."' Jones v. Conradi, 673 So.2d 389, 392 (Ala.1995) (quoting Nolen v. Clark, 238 Ala. 320, 321, 191 So. 342, 343 (1939))."
Wright v. Childree, 972 So.2d 771, 778-79 (Ala.2006). Therefore, we can presume that the two-pronged test and the application of the provisions of ง 26-18-7 as meaningful guidelines "are in fact consistent *1191 with legislative intent." HealthSouth, 851 So.2d at 42.
Based on the foregoing, we reject Judge Moore's assertion that the two-pronged test is improper under the CPA and that our courts should not be required to find that a child is dependent before terminating a parent's rights. Likewise, we reject Judge Moore's assertion that our courts should not consider the child's best interest in determining whether to terminate a parent's rights.
Section 26-18-2 of the CPA provides that the guidelines established by the CPA are to be "used ... in such a manner as to protect the welfare of children by providing stability and continuity in their lives...." (Emphasis added.) This expressed legislative policy of protecting "the welfare of children" in cases involving the termination of parental rights mirrors a long-standing judicial policy of considering the child's best interest in such cases.[16]
Our consideration of the child's best interest pursuant to judicial precedent and express legislative intent does not, as Judge Moore suggests, improperly elevate the child's interest above the parent's rights. This court has long recognized:
"The right to maintain family integrity is a fundamental right protected by the due process standards of the Constitution. May v. Anderson, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953). In recognition of this right, the Alabama courts indulge a presumption that parental custody will be in the best interests of a child. Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973)."
Hamilton v. State, 410 So.2d 64, 66 (Ala. Civ.App.1982). See also McDonald v. Watkins, 18 Ala.App. 131, 132, 89 So. 306, 307 (1921) ("all things being equal, the parent should clearly be entitled to the possession and custody of the child or children, unless some good cause is shown why the parent should not be awarded the custody, for the law presumes that the best interest of a child is subserved by the parent having the custody and possession thereof"). However, this presumption is not absolute. Robles, supra, the custody case that the United States Supreme Court cited in Santosky regarding Alabama's use of the clear-and-convincing-evidence standard of proof, explains the manner in which our courts consider the rights of parents and their children.
"`Where the dispute over custody of a child is between the child's natural parent and a party who is not the child's natural parent, the natural parent has a prima facie right to the child's custody. However, the right is not absolute but is subject to the equally well settled rule *1192 that the best interests and welfare of the child are controlling in child custody cases. Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973).
"`Ordinarily there is no conflict between these two principles, since it is presumed to be in the child's best interests to place custody in the parent. Kennedy v. State Department of Pensions and Security, 277 Ala. 5, 166 So.2d 736 (1964); Smith v. Jones, 275 Ala. 148, 153 So.2d 226 (1963). However, when the parent's fitness for custody is challenged, the principle of the best interests of the child outweighs parental rights. White v. Appleton, 53 Ala.App. 702, 304 So.2d 206 (1974); Borsdorf v. Mills, supra. To remove custody from the natural parent in such a case, there must be clear and convincing evidence that it would be against the best interests of the child to remain with the natural parent. Caine v. Caine, 51 Ala. App. 607, 288 So.2d 147 (1973); Borsdorf v. Mills, supra.'"
Robles, 368 So.2d at 42 (quoting Ely v. Casteel, 341 So.2d 730, 734 (Ala.Civ.App. 1977)) (emphasis added).
In other words, the parent's rights and the child's interest are not, as Judge Moore argues, adverse. Santosky states that, "[a]t the factfinding [stage], the State cannot presume that a child and his parents are adversaries." 455 U.S. at 760, 102 S.Ct. 1388. Rather, our courts presume the reverse, i.e., that the child's best interest is served by remaining with the parents.
Additionally, the language from Santosky on which Judge Moore relies regarding the child's best interest relates specifically to the New York statute at issue in Santosky and is premised on the idea that the state should not be allowed to terminate a parent's rights absent a showing that the parent is somehow unfit. The Supreme Court stated:
"The factfinding [stage] does not purport โ and is not intended โ to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents.... Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.10
"________________
"10 The Family Court Judge in the present case expressly refused to terminate petitioners' parental rights on a `non-statutory, no-fault basis.' App. 22-29. Nor is it clear that the State constitutionally could terminate a parent's rights without showing parental unfitness. See Quilloin v. Walcott, 434 U.S. 246, 255 (1978) ('We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest,"' quoting Smith v. Organization of Foster Families, 431 U.S. 816, 862-863 (1977) (Stewart, J., concurring in judgment))."
Santosky, 455 U.S. at 759-60, 102 S.Ct. 1388.
We agree with the United States Supreme Court that the state should not be permitted "`"to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the *1193 children's best interest."'" Santosky, 455 U.S. at 760 n. 10, 102 S.Ct. 1388. Similarly, we do not believe, as Judge Moore suggests, that the state should be allowed to terminate a parent's rights merely so the child may "be adopted by a better family." 986 So.2d at 1210. Our established analysis, as stated above, does not allow such an outcome.
In Alabama, as discussed above, juvenile courts may not terminate parental rights except on clear and convincing evidence that the child is dependent and that no viable alternatives to termination exist. Pursuant to ง 26-18-2, juvenile courts should consider the welfare of the children "and at the same time ... protect the rights of their parents." (Emphasis added.) Merely considering the welfare and best interest of the child in accordance with our judicial precedent and the express intent of our legislature does not remove from a proper analysis the requirements of the two-pronged test or the ง 26-18-7 factors. Accordingly, our analysis, as it has been applied for decades, does not offend the parents' constitutional rights as Judge Moore suggests.
In T.S. v. J.P., 674 So.2d 535 (Ala. Civ.App.1995), which Judge Moore cites as holding that "a juvenile court cannot simply terminate parental rights based on the best interests of the child," 986 So.2d at 1209, this court actually considered whether the CPA or the Alabama Adoption Code ("AAC"), ง 26-10A-1 et seq., Ala.Code 1975, governed the termination of parental rights in conjunction with an adoption proceeding. This court held that the AAC and the CPA were to be read in pari materia and that the CPA governed the termination of parental rights, even in adoption proceedings. The court stated the appropriate rules to be applied in termination-of-parental-rights cases as follows:
"In the CPA, our legislature clearly provided guidelines and standards for terminating parental rights based upon clear and convincing evidence. Ala. Code 1975, ง 26-18-7. Mindful of the serious nature of cases involving the termination of parental rights and the need to comply with the requirements of due process, our Supreme Court established a two-pronged test to be applied. Ex parte Beasley, 564 So.2d 950 (Ala. 1990). The court must determine whether grounds for termination exist, including, but not limited to, those specifically listed in ง 26-18-7, and must also determine whether all viable alternatives to the termination of parental rights have been considered. Beasley, 564 So.2d 950. Paramount in a determination regarding the termination of parental rights is a consideration of the child's best interest. Beasley, 564 So.2d 950. Furthermore, where the State or a nonparent seeks to terminate parental rights, the court must find that the child is dependent. Beasley, 564 So.2d 950. Additionally, we note that the United States Supreme Court has held that, in a termination of parental rights proceeding, a `clear and convincing evidence' standard of proof satisfies the requirements of due process, while a lesser standard does not. Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)."
674 So.2d at 537 (emphasis added). Accordingly, T.S. addressed the juvenile court's failure to apply the appropriate analysis under Beasley and the CPA, not its consideration of the child's best interests. Indeed, the correct analysis in termination-of-parental-rights cases, as set forth in T.S., includes a "consideration of the child's best interest." Id.
Therefore, we will review the juvenile court's judgment to determine whether *1194 clear and convincing evidence showed that the child was dependent and that no viable alternatives to termination existed. We will apply the provisions of ง 26-18-7 as meaningful guidelines, and we will consider the best interests of the child.

Analysis
The mother raises two issues on appeal. First, she argues that the juvenile court erred in concluding that the child was dependent because, she argues, the juvenile court did not properly consider evidence related to her current situation. Second, the mother argues that viable alternatives to termination of her parental rights existed. Specifically, she argues that J.M.T. and M.B. were viable alternatives for placement of the child.
"This court has consistently held that the existence of evidence of current conditions or conduct relating to a parent's inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence." D.O. v. Calhoun County Dep't of Human Res., 859 So.2d 439, 444 (Ala.Civ.App. 2003). See also P.H. v. Madison County Dep't of Human Res., 937 So.2d 525, 531 (Ala.Civ.App.2006) (quoting D.O.). The mother bases her argument regarding the juvenile court's determination of dependency on this language from D.O. and P.H. She argues that the juvenile court did not properly consider evidence indicating that, at the time of the termination hearing, she and the father had "made significant progress towards overcoming [their] addictions," that they had a suitable home, that she had never been convicted of a felony, and that she and the father had transportation and had been employed for 12 months.
The record shows that the juvenile court received extensive evidence regarding the current situation of the mother and the father at the time of the termination hearing, including the evidence the mother discusses on appeal. Additionally, the juvenile court received evidence indicating that the mother had not attended Narcotics Anonymous or any other support program since January 2006 and that the mother was "handling" her addiction solely through her relationship with the CRP, which was set to terminate two months after the termination hearing. The mother is married to and lives with the father, who, at the time of the hearing, was also not in any kind of support program and had failed to comply with a court order to submit to inpatient rehabilitation. The evidence also showed that both the mother and the father had unpaid criminal fines. On the other hand, the relevant current circumstances as they relate to the child are these: she is learning and developing well; she has lived in a stable foster home under the foster mother's care from the time she was seven weeks old; and she has developed a close bond with the foster mother, who wants to adopt her. See J.L. v. State Dep't of Human Res., 961 So.2d 839, 850 (Ala.Civ.App.2007).
The juvenile court's written judgment shows that it, in fact, considered the evidence of the parents' recent efforts. Paragraph 10 of the judgment states:
"The mother and father have an extensive history of excessive use of controlled substances of such duration or nature as to render them unable to care for the needs of the minor child. The court notes that the father and mother have made some recent efforts to remain drug free since the filing of the petition to terminate parental rights. However, the court also notes that this recent period of drug abstinence follows an all too familiar pattern. The testimony adduced at trial demonstrates that on *1195 many previous occasions the parents have also remained drug free for short periods of time only to resume their long-standing pattern of drug abuse."
"In deciding to terminate parental rights, a trial court may consider the past history of the family as well as the evidence pertaining to current conditions." T.B. v. Lauderdale County Dep't of Human Res., 920 So.2d 565, 570 (Ala.Civ.App.2005).[17] The juvenile court also had the advantage of observing witnesses, including the mother, as they testified, and, therefore, it was able to assess their demeanor and credibility.
Much of the evidence regarding the family's past history was disputed. Based on the ore tenus rule, the juvenile court's factual findings based on that evidence are entitled to a presumption of correctness. See F.I., 975 So.2d at 972; Ex parte State Dep't of Human Res., 834 So.2d at 122; and G.L.C. v. State Dep't of Human Res., 777 So.2d 706, 709 (Ala.Civ. App.1999). The undisputed evidence regarding the family's past history supported the juvenile court's findings regarding several of the ง 26-18-7 factors. The evidence showed that the mother had a history of abstaining from drugs for extended periods of time only to use drugs again months later. Specifically, the mother testified that she had once refrained from using drugs for 15 months, during her pregnancy with C.C.B. and 6 months thereafter, only to return to using drugs when C.C.B.'s father left her. Based on that evidence, and evidence indicating that the mother's treatment through the CRP was near its end and she was not participating in any support program, the juvenile court did not err in concluding that the mother had an extensive history of using controlled substances of such duration and nature as to render her unable to care for the needs of the child. See ง 26-18-7(a)(2).
Regarding other ง 26-18-7 factors, the evidence showed that the mother's rights to C.C.B., a sibling of the child, had been involuntarily terminated, see ง 26-18-7(a)(8); that the mother had failed to maintain regular visits with the child, see ง 26-18-7(b)(2); that the mother had failed to maintain contact and to communicate with the child for eight months, between March and November 2005, see ง 26-18-7(b)(3); and that the mother had an extensive history of failing to adjust her circumstances to meet the needs of the child, see ง 26-18-7(b)(4).
Additionally, the mother is married to and lives with the father, whose parental rights to the child have been terminated. Allowing the child to be placed with the mother would, in effect, place her with the father, a parent who has been determined to be unable or unwilling to discharge his parental responsibilities and whose conduct or condition renders him unable to properly care for the child and whose conduct or condition is unlikely to change in the foreseeable future. The juvenile court could properly have considered the mother's residing with the father as a factor rendering her unable to properly care for the child. Cf., D.H. v. Calhoun County Dep't of Human Res., 837 So.2d 313, 315 (Ala.Civ.App.2002)(paternal grandfather not a viable alternative resource because he resided with the father whose parental rights had been terminated and with an *1196 uncle accused of sexual abuse); Moore v. State Dep't of Pensions & Sec., 470 So.2d 1269, 1271 (Ala.Civ.App.1985) ("The grandmother and the mother live in the same apartment. Thus, placing [the child] with the grandmother would in effect be placing him with his mother, and would thereby defeat the purposes of removing the child from her.").
We applaud the mother's attempts to free herself from her drug addiction and her efforts to stabilize her life. However, because the juvenile court's factual findings are presumed to be correct, we cannot say that the juvenile court's judgment determining that the child was dependent was not supported by clear and convincing evidence.
We next consider the second issue the mother raises on appeal, i.e., whether J.M.T. and M.B. were viable alternatives for placement of the child under the second prong of the two-pronged test. Regarding J.M.T., DHR presented clear and convincing evidence indicating that she had a significant documented history of neglect and domestic violence. J.M.T. denied the reports. "`The trial court, as the finder of fact, is required to resolve conflicts in the evidence.' Ethridge v. Wright, 688 So.2d 818, 820 (Ala.Civ.App.1996)." D.M. v. Walker County Dep't of Human Res., 919 So.2d 1197, 1214 (Ala.Civ.App. 2005). Because the juvenile court had the responsibility and the opportunity to observe the witnesses and assess their demeanor and credibility, see Jeter, 428 So.2d at 85; Fann, 810 So.2d at 633, its decision that J.M.T. was not a viable alternative for placement of the child is presumed to be correct. Regarding M.B., the evidence showed that, although Jackson had contacted her several times, she never showed a willingness to care for the child and did not testify at the termination hearing. The mother did not present any evidence to dispute Jackson's testimony.
No other evidence in the record shows that a viable alternative for placement of the child existed, and the mother does not argue on appeal that any other alternatives existed. Accordingly, the juvenile court properly considered and rejected all viable alternatives to the termination of the mother's parental rights. See Beasley, 564 So.2d at 952.
Because the juvenile court's determination that the child was dependent and that J.M.T. and M.B. were not viable alternatives for placement were supported by clear and convincing evidence, we affirm the judgment terminating the mother's parental rights to the child.
AFFIRMED.
PITTMAN and BRYAN, JJ., concur.
MOORE, J., concurs in the result, with writing.
THOMAS, J., recuses herself.
MOORE, Judge, concurring in the result.
I concur in the result. Although I believe that DHR did not prove by clear and convincing evidence that the mother is unable and unwilling to discharge her parental responsibilities to the child, I agree that clear and convincing evidence proved that the mother's present, and foreseeable future, circumstances โ specifically continuing to live with the father whose parental rights have been irrevocably terminated due to his demonstrated inability to properly care for the child โ render her unable to properly care for the child. I further believe that the juvenile court could have placed the child with M.S. and granted the mother visitation, subject to the exclusion of the father during the visitation period, as a viable alternative to *1197 termination of the mother's parental rights; however, I conclude that the mother did not raise that argument in her appellate brief and that clear and convincing evidence supports the juvenile court's determination that placement of the child with the mother's relatives was not a viable alternative.
However, I do not agree with many of the statements of law contained in the main opinion. First, I do not believe that factual findings, based on evidence presented ore tenus, in a judgment terminating parental rights should be presumed correct and should be set aside only if "plainly and palpably wrong." See F.I. v. State Dep't of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Second, I do not believe that the juvenile court must find that a child is dependent in order to terminate parental rights. See Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). Third, I do not believe that ง 26-18-7, Ala.Code 1975, merely "guides" the juvenile court in determining whether grounds for termination exist, see 986 So.2d at 1184; rather, ง 26-18-7 states the exclusive grounds for terminating parental rights. Fourth, I do not believe that the "termination of parental rights requires clear and convincing evidence that termination would be in the child's best interests," see R.B. v. State Dep't of Human Res., 669 So.2d 187, 190 (Ala.Civ.App.1995), or that a parent's rights to a child may be terminated "if it is shown that parental custody is contrary to [the best interests of the child]." See Brown v. Alabama Dep't of Pensions & Sec., 473 So.2d 533, 534 (Ala.Civ.App.1985). Fifth, in deciding whether grounds for termination of parental rights exist, I do not believe that it is appropriate to consider that the child is thriving in foster care and that the foster parent is willing to adopt the child. See 986 So.2d at 1181-82.

Standard of Appellate Review
In Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), the United States Supreme Court held that before a state may sever completely and irrevocably the rights of a parent in their natural child, due process requires that the state support its allegations by at least clear and convincing evidence. 455 U.S. at 748, 102 S.Ct. 1388. In Santosky, the United States Supreme Court recognized that state intervention to terminate the relationship between a parent and a child must be accomplished with due process. 455 U.S. at 753, 102 S.Ct. 1388. These protected due-process rights arise from the fundamental right of a parent to the care, custody, and management of his or her child. Id. Rights of such a fundamental nature do not evaporate simply because the state has concluded that the parents have not been model parents or because the parents have temporarily lost custody of the children. 455 U.S. at 753, 102 S.Ct. 1388. "If anything, persons faced with forced dissolution of their parental rights have a more critical need for procedural protections than do those resisting state intervention into ongoing family affairs." 455 U.S. at 753, 102 S.Ct. 1388. The Court in Santosky concluded that termination-of-parental-rights cases demand proof by clear and convincing evidence because of the "commanding" individual liberty at stake, the "substantial" risk of error, and the comparatively slight governmental interest involved. 455 U.S. at 758-68, 102 S.Ct. 1388.
In a termination-of-parental-rights case, the state seeks to irreversibly extinguish a fundamental liberty interest more precious than any property right. 455 U.S. at 758-59, 102 S.Ct. 1388. The risk of erroneously terminating this right is decreased by use of a clear-and-convincing-evidence standard. 455 U.S. at 761-65, 102 S.Ct. *1198 1388. No governmental interest has been identified to warrant a burden of proof less demanding than clear and convincing evidence in such cases. 455 U.S. at 766-68, 102 S.Ct. 1388.
In compliance with Santosky, Alabama law permits a juvenile court to terminate parental rights on a petition filed by the state only if the state establishes by clear and convincing evidence that grounds for termination exist and that an alternative less drastic than termination of parental rights is not available. See Ala.Code 1975, ง 26-18-7(a); see also Ex parte Beasley, 564 So.2d at 952. Although the statute governing termination of parental rights does not define "clear and convincing evidence," this court, in L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002), adopted the same definition of clear and convincing evidence as is used in civil actions seeking punitive damages and in workers' compensation cases seeking benefits for gradual injuries. In such cases, "clear and convincing evidence" is defined as:
"Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt."
See ง 6-11-20(4) and ง 25-5-81(c), Ala. Code 1975. This definition, which was recently cited with approval by our supreme court, see Ex parte T.V., 971 So.2d 1, 9 (Ala.2007), conforms with the constitutional analysis set forth in Santosky by "`"instruct[ing] the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication."'" 455 U.S. at 755, 102 S.Ct. 1388 (quoting Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), quoting in turn In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)). The individual rights at stake in a termination of parental rights case have been recognized as "`particularly important'" and "`more substantial than mere loss of money.'" Santosky, 455 U.S. at 756, 102 S.Ct. 1388 (quoting Addington, 441 U.S. at 424, 99 S.Ct. 1804); hence, it would be inappropriate to use any definition of "clear and convincing evidence" that imposes a lesser burden on the fact-finder than that used in civil actions affecting solely property rights.
This court and our supreme court have often stated the following as the proper standard of review in termination-of-parental-rights cases:
"`The trial court's decision in proceedings to terminate parental rights is presumed to be correct when the decision is based upon ore tenus evidence and such a decision based upon such evidence will be set aside only if the record shows it to be plainly and palpably wrong.' Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala.1993)."
Ex parte T.V., 971 So.2d at 4. This standard, known as the ore tenus rule, predates the Santosky decision and may be found in early cases considering the effect of statutes empowering juvenile courts to permanently terminate the custody rights of natural parents on application by state agencies. See, e.g., Smith v. State Dep't of Pensions & Sec., 340 So.2d 34 (Ala.Civ. App.1976). However, it does not appear that this court or our supreme court has expressly considered the effect of the Santosky-mandated clear-and-convincing-evidence burden of proof on the scope of appellate review. See, e.g., Blackburn v. *1199 Blackburn, 249 Ga. 689, 692, 292 S.E.2d 821, 825 (1982) (concluding that Santosky required the court to reexamine the proper standard of appellate review in termination-of-parental-rights cases).[18]
The constitutional concerns implicated in every termination-of-parental-rights case command stricter scrutiny than the ore tenus rule provides. See, e.g., In re C.N.G., 109 S.W.3d 702, 705 (Mo.Ct.App. 2003) ("We review termination of parental rights cases closely because termination of parental rights interferes with a basic liberty: freedom from governmental interference with family and child rearing."); and In re S.B.C., 64 P.3d 1080, 1083 (Okla. 2002) ("Any level of appellate scrutiny that is less stringent than that of searching for proof of clear-and-convincing nature will undermine the higher level of protection imposed by Santosky to safeguard the parents' fundamental right to their offspring.").
"[J]udicial review is generally limited to ascertaining whether the evidence relied upon by the trier of fact was of sufficient quality and substantiality to support the rationality of the judgment." Woodby v. Immigration & Naturalization Serv., 385 U.S. 276, 282, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966). When fundamental constitutional rights involving the family are at stake, applying the ore tenus rule does not adequately test the sufficiency of the evidence supporting the rationality of the judgment. As pronounced above, the ore tenus rule presumes that the trial court correctly decided the case and recognizes that the judgment of the trial court will be reversed only if the record shows its judgment to be plainly and palpably wrong. See Ex parte Beasley, supra. If applied as stated, the ore tenus rule would not satisfactorily protect the due-process rights of the parents, which require this court to assure that the decision to terminate their rights was based at least on clear and convincing evidence. Although no court has held unconstitutional a standard of review that fails to recognize the fundamental rights at stake in termination-of-parental-rights cases, it appears that such a failure may very well violate due process. See In re S.B.C., 64 P.3d at 1082 n. 12. At the very least, it undermines the heightened level of protection recognized in Santosky as applicable to fundamental parental rights.
In this case, the main opinion does not rely on the statement of the ore tenus rule set out in Ex parte T.V. and similar cases; it summarizes the ore tenus rule as follows:
"A juvenile court's factual findings based on ore tenus evidence in a judgment terminating parental rights are presumed correct and will not be disturbed unless they are plainly and palpably wrong."
986 So.2d at 1183 (quoting F.I. v. State Dep't of Human Res., 975 So.2d at 972). Although it is probably a more accurate statement of the ore tenus rule, this expression of the standard of review still does not comport with the due-process analysis established in Santosky, supra. In termination-of-parental-rights cases, the *1200 issues of whether grounds for termination exist and whether viable alternatives to termination exist are factual questions. See generally Ex parte T.V., supra. To comply with due process, this court cannot begin its appellate review with a presumption that the juvenile court correctly decided those factual issues. By presuming that the juvenile court correctly decided the facts against the parent, this court places an undue burden on the parent to overcome that presumption. To comply with due process, as explained in Santosky, this court should not indulge any presumption that a juvenile court correctly found that grounds for termination exist and that viable alternatives to termination are not available. Rather, the court should simply review the record to determine if the factual findings are supported by clear and convincing evidence, with no presumption one way or the other.
A judgment terminating parental rights that is based on factual findings unsupported by clear and convincing evidence is reversible. See, e.g., Ex parte T.V., supra. This court need not further find that the judgment is "plainly and palpably wrong." A judgment terminating parental rights is "plainly and palpably wrong" if based on factual findings that are unsupported by clear and convincing evidence. If that phrase has any other meaning, that meaning has never been explained in termination-of-parental-rights cases. If that phrase means that a judgment terminating parental rights should be reversed if it is obvious to this court that the judgment is wrong, then that phrase presents no discernible standard of review that would be consistent with due process; it leaves to this court ultimate unbridled discretion to decide the correctness of a juvenile court's decision based on its own peculiar subjective views. Such a standard is so vague and meaningless that it cannot properly be applied in termination-of-parental-rights cases, in which fundamental due-process rights are at stake.
It appears, however, that the appellate courts of this state have not consistently applied the ore tenus rule as stated in Ex parte T.V. or F.I. in termination-of-parental-rights cases. In fact, 20 years ago this court recognized its duty to search the record for clear and convincing evidence supporting a termination of parental rights. Ironically, in a case defending the applicability of the ore tenus rule, this court said: "The appellate court must find, within the record, sufficient evidence that is clear and convincing in order to affirm [a judgment terminating parental rights]." Columbus v. State Dep't of Human Res., 523 So.2d 419, 421 (Ala.Civ.App.1987); see also L.M. v. State, 591 So.2d 883, 885 (Ala.Civ.App.1991).
Although our supreme court has continued to cite the ore tenus rule in termination-of-parental-rights cases, it has simultaneously recognized that appellate review of a judgment terminating parental rights requires the court to determine if clear and convincing evidence supports the juvenile court's judgment. See, e.g., Ex parte T.V., 971 So.2d at 8 ("[T]his Court must review not only whether [the child] remains dependent, but also whether the trial court considered and rejected, based on clear and convincing evidence, the possible viable alternatives before terminating T.V.'s parental rights.").
In practice, this court routinely reviews the record to determine if clear and convincing evidence supports the juvenile court's finding of dependency and the juvenile court's finding that no less-drastic alternative to termination of parental rights exists. See, e.g., D.H. v. Calhoun County Dep't of Human Res., 837 So.2d 313, 314 (Ala.Civ.App.2002) (upholding judgment terminating parental rights when "the record *1201 contain[ed] clear and convincing evidence that the children [were] dependent" and that no viable alternative to termination existed); B.G. v. State Dep't of Human Res., 875 So.2d 305, 308 (Ala.Civ.App. 2003) (reversing on ground that evidence in support of DHR petition to terminate parental rights was not "`so "clear and convincing" as to support "the last and most extreme disposition permitted by law, the termination of parental rights"'"). Indeed, in this very case, the main opinion recognizes that it is the function of the appellate courts to "review the trial court's judgment to determine if it is supported by the appropriate level of evidence," 986 So.2d 1186, referring, of course, in this case, to clear and convincing evidence.
The time has now come to expressly recognize that which our supreme court and this court long ago implicitly acknowledged: (1) in reviewing the judgment of a juvenile court terminating parental rights, this court does not apply any presumption of correctness either to the juvenile court's factual findings or to its ultimate judgment, and (2) this court does not affirm a judgment terminating parental rights unless that judgment is proven to be plainly and palpably wrong but examines the record to determine if the petitioner established grounds for termination and lack of viable alternatives to termination by clear and convincing evidence. This standard of review necessarily requires this court to review the evidence supporting the findings as well as the countervailing evidence to determine if the evidence could have produced in the mind of a reasonable trier of fact a firm conviction, as well as a high probability as to the correctness of the conclusions, that grounds for termination exist and that no less-drastic alternative to termination of parental rights is available. See Blackburn, 249 Ga. at 694, 292 S.E.2d at 826; In re Michaela C., 809 A.2d 1245 (Me.2002); State v. Germai M., 14 Neb. App. 763, 714 N.W.2d 780 (2006); In re C.C., 173 N.C.App. 375, 618 S.E.2d 813 (2005); Department of Soc. Servs. v. Phillips, 365 S.C. 572, 618 S.E.2d 922 (Ct.App. 2005); In re K.N.R., (No. M2003-01301-COA-R3-PT, Dec. 23, 2003) (Tenn.Ct.App. Dec. 23, 2003) (not reported in S.W.3d); and In re J.F.C., 96 S.W.3d 256 (Tex.2002).
In this case, the judgment of the juvenile court is correct because clear and convincing evidence supports the finding that one of the grounds for termination of parental rights exists and clear and convincing evidence supports the finding that none of the alternatives to termination suggested by the mother were viable. The judgment is not correct simply because the mother failed to overcome the presumption of its correctness by establishing that those findings were plainly and palpably wrong. Because the main opinion indicates that the judgment of the juvenile court is due to be affirmed based on the ore tenus rule, I cannot concur in its analysis.

Dependency
This court has repeatedly quoted Ex parte Beasley, 564 So.2d 950, for the proposition that a juvenile court must find that the child is dependent as part of the two-prong analysis to be used in termination-of-parental-rights cases. However, that statement from Beasley is pure dicta and derives from cases decided under the precursor to the present termination-of-parental-rights statute. Section 26-18-7 sets forth the exclusive grounds for termination of parental rights, neither of which requires a finding of dependency.
Prior to the enactment of ง 26-18-7, the power of a juvenile court to terminate parental rights rested solely in งง 12-15-65(e) and 12-15-71(a)(6) of the Alabama Juvenile Justice Act ("the AJJA"), ง 12-15-1 *1202 et seq., Ala.Code 1975. Section 12-15-71(a)(6), which is now found at ง 12-15-71(a)(5), provided, in pertinent part, that "[i]f a child is found to be dependent, the [juvenile] court may ... award permanent custody to [DHR] ... with termination of parental rights...." Section 12-15-65(e), which is now found at ง 12-15-65(f), provided, in pertinent part, that "[i]f the court finds from clear and convincing evidence, competent, relevant, and material in nature that parental right should be terminated, the court may proceed immediately... to make proper disposition of the case." Naturally, because those provisions of the AJJA premised all terminations of parental rights on a previous finding of dependency, based on clear and convincing evidence, the cases applying the AJJA required clear and convincing evidence that the child was dependent. See, e.g., Burnett v. Alabama Dep't of Pensions & Sec., 469 So.2d 627 (Ala.Civ.App.1985); Landers v. Association for Guidance, Aid, Placement & Empathy of North Alabama, Inc., 472 So.2d 1055 (Ala.Civ.App.1985).
In 1984, the legislature adopted the Child Protection Act, ง 26-18-1 et seq., Ala.Code 1975 ("the CPA"). The legislature plainly stated the purposes of the CPA in ง 26-18-2, Ala.Code 1975, which provides:
"It is the purpose of this chapter to provide meaningful guidelines to be used by the juvenile court in cases involving the termination of parental rights in such a manner as to protect the welfare of children by providing stability and continuity in their lives, and at the same time to protect the rights of their parents."
Section 26-18-7(a) sets forth the grounds for termination of parental rights, which are: (1) "that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child," or (2) "that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future." Neither of these statutory grounds for termination of parental rights mentions "dependency."
In Clemons v. Alabama Department of Pensions & Security, 474 So.2d 1143 (Ala. Civ.App.1985), however, this court fully incorporated the two-prong standard applicable to the AJJA into the law construing the CPA by holding:
"In order to terminate parental rights, the court must apply what is essentially a two-prong test. First, the court must find from clear and convincing evidence that the child is dependent. ง 12-15-65(e), Code of Alabama 1975.... Once dependency is found, our court has stated that the trial court must determine whether less drastic measures than termination of parental rights would best serve the interest of the child...."
474 So.2d at 1145. Thus, the court construed a statute that does not even contain the word "dependency" to be operative only upon a finding of dependency.
Following Clemons, this court repeated the two-prong standard as the overarching method for analyzing termination of parental rights cases. See Fortenberry v. Alabama Dep't of Pensions & Sec., 479 So.2d 54 (Ala.Civ.App.1985); and Brand v. Alabama Dep't of Pensions & Sec., 479 So.2d 66 (Ala.Civ.App.1985). In Ex parte Brooks, 513 So.2d 614 (Ala.1987), the first Alabama Supreme Court case to consider the CPA, the court adopted the standard without any real consideration of its accuracy when it said:
"Before parental rights will be terminated, the Court must determine from clear and convincing evidence that the child is dependent and, after having made a finding of dependency, must determine *1203 whether there exists a remedy less drastic than termination of those rights."
513 So.2d at 617.
In Ex parte Beasley, 564 So.2d 950, a divorced mother filed a petition to terminate the parental rights of her ex-husband, her child's natural father. This court held that because the termination-of-parental-rights statute requires a finding of dependency, a juvenile court could not terminate the parental rights of a nondependent child. Beasley v. Beasley, 564 So.2d 948 (Ala.Civ.App.1989). On certiorari review, the supreme court reversed this court's judgment. The court acknowledged that "nowhere in the [CPA] does the Act require a `finding of dependency' by a court before it can order the termination of parental rights to a child." 564 So.2d at 952. Rather, the court reasoned, in ง 26-18-7(a) "the Legislature ... has established specifically the grounds upon which a court must base any order to terminate parental rights." 564 So.2d at 953. The court held that in proceedings brought by a parent against another parent, the statute does not require a finding of dependency, but requires only findings that the grounds for termination have been established and that all viable alternatives to termination of parental rights have been considered. Id.
Although Beasley did not concern an action by the state to terminate parental rights, the court nevertheless addressed that different situation. The court reasoned that when the state seeks to terminate parental rights, the fundamental constitutional rights of the parents demand proof of dependency to assure that the parental relationship is not subjected to undue state interference. 564 So.2d at 954. The court concluded that the state could file a petition to terminate parental rights only when both parents are found to be unfit or otherwise unable to discharge their parental responsibilities, in which case the child would be dependent. Id. Hence, the court held:
"First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in ง 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. (As earlier discussed, if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)
"Once the court has complied with this two-prong test โ that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child โ it can order the termination of parental rights. Such a construction of the Uniform 1984 Child Protection Act clearly comports with the stated purpose for the Act."
564 So.2d at 954-55.
In a special writing concurring in the result, Justice Maddox pointed out that because the case did not involve a petition to terminate parental rights filed by a state agency, the entire analysis resulting in a conclusion that a juvenile court would have to find dependency in such a case amounted to no more than dicta. 564 So.2d at 958 (Maddox, J., concurring in the result). According to Justice Maddox, not only did this discussion have no binding legal effect, it was incorrect. Justice Maddox acknowledged that the language of the AJJA plainly requires a finding of dependency as a prerequisite to a termination of parental rights. 564 So.2d at 955-56. However, as Justice Maddox noted and the *1204 majority opinion in Beasley recognized, the language of the CPA, which Justice Maddox characterized as a comprehensive act governing the procedural and substantive law regulating termination of parental rights, does not require any finding of dependency. Justice Maddox stated that, although a child would probably be dependent in any case in which the state proved the statutory grounds for termination, the CPA requires neither proof of dependency as a separate matter nor a "finding of dependency" as a procedural matter. 954 So.2d at 958. Hence, Justice Maddox concluded, any case stating otherwise is "clearly wrong" and due to be overruled. 564 So.2d at 955. If not, he asserted, the requirement of a finding of dependency engrafted on the statute by this misstatement of the law would be perpetuated in future cases. 564 So.2d at 958 n. 10 (quoting Lorence v. Hospital Bd. of Morgan County, 294 Ala. 614, 618-19, 320 So.2d 631, 634-35 (1975), quoting in turn Sam Walter Foss from Stevenson, The Home Book of Verse (Henry Holt & Co., N.Y., 7 ed., 1940, at p. 1896)).
As Justice Maddox feared, the enunciation of the two-prong standard in Beasley infiltrated subsequent cases and has since become the predominant statement of the burden of proof in termination-of-parental-rights cases brought by a nonparent. This court immediately began to cite Beasley for the proposition that parental rights could be terminated upon a finding of dependency and consideration and rejection of all other viable alternatives. See, e.g., Miller v. Knight, 562 So.2d 274 (Ala.Civ. App.1990); C.D.H. v. State Dep't of Human Res., 568 So.2d 1237 (Ala.Civ.App. 1990); N.A. v. J.H., 571 So.2d 1130 (Ala. Civ.App.1990); and Carter v. Griffin, 574 So.2d 800 (Ala.Civ.App.1990).
In Ex parte State Department of Human Resources, 624 So.2d 589 (Ala.1993), our supreme court accepted Justice Maddox's reasoning to an extent by concluding that the CPA does not require a written finding of dependency; however, it did not correct the Beasley edict that a state agency must prove dependency in order to support a termination of parental rights. In fact, the court cited the two-prong Beasley standard as the operative rule regarding the burden of proof in termination-of-parental-rights actions initiated by state agencies. 624 So.2d at 952-953. The Beasley standard has been repeated by rote by the supreme court ever since. See Ex parte F.P., 857 So.2d 125 (Ala. 2003); Ex parte J.R., 896 So.2d 416 (Ala. 2004); and Ex parte T.V., 971 So.2d 1. This court has also routinely cited Beasley as stating the standard to be used in determining whether a juvenile court has properly terminated parental rights, see, e.g., A.R.E. v. E.S.W., 702 So.2d 138 (Ala.Civ. App.1997); T.H. v. State Dep't of Human Res., 740 So.2d 1089 (Ala.Civ.App.1998); and W.L.H. v. B.L.M., 829 So.2d 173, 174 (Ala.Civ.App.2002), even while at least one member of the court has maintained that the statute does not require a finding of dependency. See B.J.C. v. D.E., 874 So.2d 1109, 1120 (Ala.Civ.App.2003) (Murdock, J., dissenting). Such is the way dicta becomes entrenched as the law. Ex parte Beasley, 564 So.2d at 958 (Maddox, J., concurring in the result).
The main opinion asserts that the analysis in Ex parte Beasley of state-initiated petitions to terminate parental rights is not dicta and that a finding of dependency is necessary to protect the due-process rights of parents. "Obiter dictum" is defined as "[a] judicial comment made while delivering an opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive)." Black's Law Dictionary 1102 (8th ed.2004). The only issue in Ex parte Beasley was whether a *1205 parent needs to prove dependency in order to obtain a judgment terminating another parent's parental rights. Any comment regarding the burden of proof on a state agency petitioning to terminate parental rights was unnecessary to decide that issue; hence, the pronouncements in Ex parte Beasley regarding the "dependency requirement" should have had no precedential effect, as Justice Maddox pointed out in his special writing.
Additionally, despite our supreme court's comments in Ex parte Beasley, a finding of dependency is not necessary to confer standing on the state to file a petition to terminate parental rights. As set out in footnote 8 of the main opinion in this case, ง 26-18-5(b) and 42 U.S.C. ง 675(5)(E) confer standing on DHR to file petitions to terminate parental rights in cases like this one when the children have been in foster care for 15 of the most recent 22 months. Moreover, by statute, DHR has standing to file a petition to terminate parental rights at any time. See Ala.Code 1975, ง 26-18-5(a).
Likewise, a finding of dependency is not necessary to protect the due-process rights of parents. As established in Santosky, supra, in order to satisfy due process, a state must establish by clear and convincing evidence that a parent is unfit to properly care for the child. Consistent with Santosky, under the CPA, a parent's fundamental right to the care, custody, and control of the child may only be overcome by clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child or that the parent suffers from some condition that renders the parent unable to properly care for the child and that such condition is unlikely to change in the foreseeable future. Ala.Code 1975, ง 26-18-7(a). The CPA properly protects the due-process rights of parents without predicating a termination of parental rights on a finding of dependency.
Although it is incorrect to say that parental rights may be terminated in a proceeding initiated by a state agency only upon proof of the child's dependency, that error has been ameliorated somewhat by the contemporaneous statement that in this context "dependency" refers to "grounds for termination." For example, in Ex parte T.V., supra, the court said: "For a finding of dependency, the court must consider whether there are grounds for terminating the parental rights." 971 So.2d at 4. By defining "dependency" as "grounds for termination," these cases properly remove the focus of the inquiry away from the child's circumstances to the conduct or condition of the parents. Interpreting "dependency" in this fashion, the court does not decide whether the child is dependent as a threshold to a termination of parental rights, but correctly determines whether the conduct or condition of the parent renders the parent unable or unwilling to discharge his or her parental responsibilities and/or to properly care for the child.
Because this court and our supreme court have vacillated on the meaning of "dependency" in applying the two-prong test of Ex parte Beasley, it would be imprecise to say that the appellate courts of this state have given the CPA a settled construction. Accordingly, this court should not apply the rule that "`"`"the Legislature is presumed to have known the fixed judicial construction preexisting statutes had received, and the substantial re-enactment of such statutes is a legislative adoption of that construction."'"'" 986 So.2d at 1190 (quoting Wright v. Childree, 972 So.2d 771, 779 (Ala.2006), quoting in turn other cases). Moreover, by reenacting the statute without adopting the term "dependency" or referring in any *1206 way to "dependency," it is difficult to see how it may be inferred that the legislature intended to incorporate that concept into the CPA.
Because this court is responsible for erroneously incorporating the "dependency" prong into the CPA jurisprudence, this court should be the court to correct its error. In future cases, the court should acknowledge the legislative intent behind the CPA and cease using the two-prong test from Beasley, at least to the extent it requires clear and convincing evidence that the child is dependent. Because the main opinion refers to this standard, I cannot concur in its analysis.

The Exclusivity of ง 26-18-7
As set out above, in enacting the CPA, the legislature intended to set forth the guidelines to be used by juvenile courts when considering a petition to terminate parental rights. The statute sets forth two, and only two, grounds for termination. The statute lists eight factors for a juvenile court to consider in deciding whether there is clear and convincing evidence of the first ground for termination โ that the parent is unable or unwilling to discharge his or her parental responsibilities to and for the child. See Ala.Code 1975, ง 26-18-7(a)(1)-(8). The statute also lists four additional factors for the juvenile court to consider when the child is no longer in the custody of the parent. See Ala.Code 1975, ง 26-18-7(b)(1)-(4). Finally, the CPA declares that abandonment for four months preceding the date of the filing of the petition for termination of parental rights creates a rebuttable presumption that the parent is unable or unwilling to discharge his or her responsibilities to the child. Ala.Code 1975, ง 26-18-7(c).
As the plain language of the statute indicates, the statutory factors listed in ง 26-18-7(a) and (b) are not themselves independent grounds for termination. They are merely circumstances the legislature explicitly recognized as suggesting the inability or unwillingness of a parent to discharge his or her parental responsibilities. For example, parental rights may not be terminated solely on the ground that a parent has a long history of drug abuse. See Ala.Code 1975, ง 26-18-7(a)(2) (requiring the juvenile court in most cases to consider whether the parent has excessively used controlled substances "for such duration or nature as to render the parent unable to care for [the] needs of the child"). Rather, a drug abuser's parental rights may be terminated only if clear and convincing evidence proves that the drug abuse renders the parent unable or unwilling to discharge his or her responsibilities to and for the child, evidence which I find lacking in this case.
The statute expressly states that in deciding whether a parent is unable or unwilling to discharge his or her parental responsibilities to and for the child, the juvenile court is not limited to consideration of the statutory factors. Ala.Code 1975, ง 26-18-7(a). Although the statutory language plainly indicates that a juvenile court may consider other factors only for the purposes of determining whether the first statutory ground for termination exists, in Brown v. Alabama Department of Pensions & Security, 473 So.2d 533 (Ala.Civ.App.1985), and Clemons, supra, this court seized on this language to conclude that ง 26-18-7 does not set forth the exclusive grounds for terminating parental rights but merely codifies prior law allowing for other grounds for termination. Our supreme court picked up on this erroneous conclusion in Beasley, supra, when it said,
"First, the court must find that there are grounds for the termination of parental rights, including, but not limited *1207 to, those specifically set forth in ง 26-18-7."
564 So.2d at 954. That dicta, indicating that the statutory grounds are not exclusive, has been repeated many times since Beasley. See, e.g., D.M.P. v. State Dep't of Human Res., 871 So.2d 77, 81 (Ala.Civ. App.2003); and A.A. v. Cleburne County Dep't of Human Res., 912 So.2d 261 (Ala. Civ.App.2005).
Despite this dicta, it is apparent from the stated purpose of the CPA and the plain language of ง 26-18-7 that the only grounds for termination of parental rights are those two grounds listed in ง 26-18-7(a). The statute, as noted by Justice Maddox in his special writing in Ex parte Beasley, is comprehensive; it does not expressly adopt any other ground for termination and, by allowing the juvenile court to consider other factors in deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child, does not imply that parental rights may be terminated based on other unspecified grounds. Thus, ง 26-18-7(a) does not merely "guide" the determination of whether grounds for termination exists, ง 26-18-7(a) exclusively controls that determination. See Ex parte Beasley, 564 So.2d at 953 (In enacting the CPA, "[t]he Legislature ... has established specifically the grounds upon which a court may base any order to terminate parental rights."). To the extent the main opinion suggests otherwise, I cannot concur in its analysis.

The "Best Interests" Analysis
Recognizing the comprehensive and exclusive nature of ง 26-18-7, it should be obvious that termination of parental rights does not require clear and convincing evidence that termination would be in the child's best interests. The statute nowhere mentions the "best interests of the child" as a factor to be considered in determining whether grounds exist to terminate parental rights.[19] If the legislature wanted the juvenile courts to consider the best interests of the child in deciding whether grounds for termination exist, it could have easily employed language to indicate that intent in ง 26-18-7.
The only language in ง 26-18-7 that could be construed to allow consideration of the child's best interests is the language indicating that a juvenile court is not limited to consideration of statutory factors in deciding whether a parent is unable or unwilling to discharge his or her responsibilities to and for the child. However, that language does not imply that the "best interests of the child" should be considered in deciding whether grounds for termination exist.
In Santosky, supra, the United States Supreme Court held that the best interests of the child were not a factor in the adjudicatory phase of a termination-of-parental-rights proceeding under the New York law they were examining. The Court said:
"The factfinding does not purport โ and is not intended โ to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents. The State alleges that the natural *1208 parents are at fault. Fam. Ct. Act ง 614.1.(d). The questions disputed and decided are what the State did โ `made diligent efforts,' ง 614.1.(c) โ and what the natural parents did not do โ `maintain contact with or plan for the future of the child.' ง 614.1.(d). The State marshals an array of public resources to prove its case and disprove the parents' case. Victory by the State not only makes termination of parental rights possible; it entails a judicial determination that the parents are unfit to raise their own children.
"At the factfinding, the State cannot presume that a child and his parents are adversaries. After the State has established parental unfitness at that initial proceeding, the court may assume at the dispositional stage that the interests of the child and the natural parents do diverge. See Fam. Ct. Act ง 631 (judge shall make his order `solely on the basis of the best interests of the child,' and thus has no obligation to consider the natural parents' rights in selecting dispositional alternatives). But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship. Thus, at the factfinding, the interests of the child and his natural parents coincide to favor use of error-reducing procedures."
455 U.S. at 759-761, 102 S.Ct. 1388 (footnotes omitted). In footnote 11 in Santosky, the Court expounded on the child's interest in preserving the parent-child relationship by noting that when parental rights are terminated, the child loses his legal rights to maintenance and support, inheritance, and all other rights attendant to the parent-child relationship, including, in some cases, the right to ever know and associate with the parent.
In footnote 10 in Santosky, the Court indicated that it would be unconstitutional to terminate the parental relationship on the basis of the best interests of the child without proving unfitness of the parents. 455 U.S. at 760 n. 10, 102 S.Ct. 1388 (quoting Quilloin v. Walcott, 434 U.S. 246, 255, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), quoting in turn Smith v. Organization of Foster Families, 431 U.S. 816, 862-863, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (Stewart, J., concurring in judgment)) ("`We have little doubt that the Due Process Clause would be offended "[i]f a State were to attempt to force the breakup of a natural family, over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest."'"). In a dissent, Justice Rehnquist also expressed his belief that a majority of the Supreme Court would agree that a statute that required merely a showing of clear and convincing evidence that termination of parental rights would be in the child's best interests would not pass constitutional muster. Santosky, 455 U.S. at 773, 102 S.Ct. 1388 (Rehnquist, J., dissenting).
Despite the Supreme Court's pronouncements in Santosky, and the many similarities between New York's termination-of-parental-rights statute and the AJJA and CPA, this court continued to employ the best-interests-of-the-child standard in reviewing termination-of-parental-rights cases. In Grayson v. State Department of Pensions & Security, 419 So.2d 234, 236 (Ala.Civ.App.1982), this court said: "To remove custody from the natural parent there must be clear and convincing evidence that it would be against the best interests of the child to remain with the natural parent." See also Hamilton v. State, 410 So.2d 64 (Ala.Civ.App.1982); In re Sanders, 420 So.2d 790 (Ala.Civ.App. 1982).
*1209 In Rivera v. State, 444 So.2d 858, 860 (Ala.Civ.App.1983), the court said: "Before a trial court can terminate a parent's right to custody of its child, there must be clear and convincing evidence before the court that it would not be in the child's best interests to be in the natural parent's custody." This statement of the law, which was often repeated in subsequent cases, see, e.g., Mastin v. State Dep't of Pensions & Sec., 462 So.2d 938 (Ala.Civ.App.1984); and King v. State, 451 So.2d 314 (Ala.Civ. App.1984), appeared to make the best interests of the child not only the paramount, but the exclusive, consideration in termination-of-parental-rights cases.
This court also continued to cite the rule that "[e]very parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent's custody would be in the best interests of the child." A.R.E. v. E.S.W., 702 So.2d 138, 139 (Ala.Civ.App.1997); see also M.C. v. K.M., 788 So.2d 166 (Ala.Civ.App.1999).
In T.S. v. J.P., 674 So.2d 535 (Ala.Civ. App.1995), this court held, consistent with Santosky, supra, that a juvenile court cannot simply terminate parental rights based on the best interests of the child, which would be unjust, unworkable and unconstitutional. Rather, this court held, the juvenile court must follow the CPA in order to assure protection of parental rights. This court said:
"While the best interest of the child is always a paramount concern in such cases, the trial court erred in applying the `best interest' standard to the question regarding the termination of the mother's parental rights. The termination of parental rights standard provided by the CPA, and the case law interpreting the CPA, should have been applied."
674 So.2d at 538.
In his dissent in S.W. v. Walker County Department of Human Resources, 709 So.2d 1267 (Ala.Civ.App.1998), Judge Crawley relied on T.S. in criticizing this remnant of the old common-law custody cases. 709 So.2d at 1269-72 (Crawley, J., dissenting). As Judge Crawley saw it, by phrasing the test in terms of the best interests of the child, the court erroneously reduces the determination to a decision as to whether the child's interest would be better served by maintaining the relationship with the parent or by severing that relationship and awarding permanent custody to another more suitable person with higher means who can provide the child better life opportunities. 709 So.2d at 1270. Judge Crawley argued that Santosky, supra, held that the first stage of a termination-of-parental-rights proceeding does not allow a weighing of the child's best interests. 709 So.2d at 1270. In the first, or adjudicatory, stage, Judge Crawley stated, the juvenile court may only consider whether there are grounds for termination and whether there are other viable alternatives to termination. Id. "The child's `best interests' come into play only after a decision to terminate parental rights has been made." 709 So.2d at 1271 (Crawley, J., dissenting). See also G.L.C. v. State Dep't of Human Res., 777 So.2d 706, 709-712 (Ala.Civ.App.1999) (Crawley, J., dissenting); T.T. v. State Dep't of Human Res., 796 So.2d 365, 368-372 (Ala.Civ. App.2000) (Crawley, J., dissenting).
In a dissent in B.J.C. v. D.E., 874 So.2d 1109 (Ala.Civ.App.2003), Judge Murdock agreed that parental rights could not be terminated "merely by a showing (whether by clear and convincing evidence or otherwise) that removal of the child from the parent's custody would be `in the best interest *1210 of the child'...." 874 So.2d at 1119 (Murdock, J., dissenting). Rather, he noted, even under the common law, there was a presumption that it was in the child's best interests to remain in the custody of his or her parents and that presumption could only be overcome by clear and convincing evidence of unfitness or forfeiture. Id.
In this case, the main opinion conducts precisely the sort of best-interests analysis forbidden by the constitution. The main opinion notes that the child is thriving in foster care and has developed a close bond with the foster mother and that the foster mother is ready and willing to adopt the child. This evidence is cited solely to establish that it would be in the child's best interests to permanently sever the relationship with the natural mother so that the child may be adopted by a better family. A decision to terminate parental rights should never be based, even partially, on such reasoning. The state does not have the power to remove a child from his or her parents on the basis that the state finds the child's best interests would be served thereby. If that was the case, the state could remove any child from any home on the basis that a better provider, willing to take the child, exists.
Quite simply, the best interests of the child play no part in the determination of whether a parent is or is not able and willing to discharge his or her parental responsibilities to and for the child or whether a parent's conduct or condition renders the parent unable to properly care for the child. Obviously, if a parent is unable or unwilling to discharge his or her parental responsibilities to and for the child or the parent's conduct or condition is such that the parent cannot render proper care for the child, it would be in the child's best interests to be removed from the custody of the parent. In extreme cases in which clear and convincing evidence shows that it is likely the parent will never be able or willing to assume a proper parental role or that the parent's conduct or condition likely will never be resolved to the point that the parent can render proper care to the child, it may be in the child's best interests for the parent's rights to be terminated. However, the best interests of the child bear no relation to the threshold question of the parent's unfitness.
Moreover, the "best interest" standard derives from child-custody cases, which are qualitatively different from termination-of-parental-rights cases. In Striplin v. Ware, 36 Ala. 87 (1860), our supreme court recognized that a trial court could change or leave custody in a third party, rather than maintaining custody with a natural parent, upon a finding that parental custody would be contrary to the best interests of the child. The court reasoned that a parent has no natural right to a child, but is entitled to custody of the child only so long as it is in the best interests of the child.[20] Hence, upon a finding that the child's best interests would not be served by parental custody, the state may invest custody in a more suitable person. However, the court clarified that the law presumes it is in the best interests of the child to remain in the custody of its natural parents and that that presumption may only be overcome by "plain" evidence that the parent is unfit to care for the child.
Although under Alabama's common law a trial court could prevent a parent from maintaining custody of a child based on the parent's unfitness, see Neville v. Reed, 134 Ala. 317, 32 So. 659 (1902); Kirkbride v. *1211 Harvey, 139 Ala. 231, 35 So. 848 (1904); Harrist v. Harrist, 151 Ala. 656, 43 So. 962 (1907); and Montgomery v. Hughes, 4 Ala. App. 245, 58 So. 113 (1911), the common law did not empower a trial court to permanently sever the parent-child relationship. A custody order never had res judicata effect, and such an order could always be modified if, upon changed conditions, the court was satisfied that a change in custody promoted the best interests of the child. See Brown v. Brown, 2 Ala.App. 461, 469, 56 So. 589, 592 (1911); and Murphree v. Hanson, 197 Ala. 246, 72 So. 437 (1916). Hence, an unfit parent could recover custody of the child based on proof that he or she had been rehabilitated and that resumption of parental custody would serve the child's best interests. Id.
Under Alabama's early juvenile codes, an award of custody to a nonparent depended on clear and convincing evidence that the child was dependent or neglected, i.e., that the parent was not discharging his or her parental responsibilities to the child. See Sims v. State Dep't of Public Welfare, 259 Ala. 283, 284, 66 So.2d 460, 461 (1953) ("This is one of those unfortunate and tragic situations where parents are found to be unable or unwilling to provide proper care for their young children."). In this way, the law mirrored the common-law principles pronounced in Striplin v. Ware, supra. Just as with custody decrees arising in ordinary divorce cases, a decree under the early juvenile codes divesting a parent of custody of a child remained subject to modification based on a subsequent material change of circumstance and the best interests of the child. See generally Bianco v. Graham, 268 Ala. 385, 106 So.2d 655 (1958); Chisolm v. Crook, 272 Ala. 192, 130 So.2d 191 (1961); and Borsdorf v. Mills, 49 Ala.App. 658, 275 So.2d 338 (1973).
The resemblance to ordinary custody cases was so great that in many juvenile cases the appellate courts, when discussing the proper disposition of the child, barely mentioned the juvenile code, if at all. See, e.g., Borsdorf v. Mills, supra; and Kennedy v. State Dep't of Pensions & Sec., 277 Ala. 5, 166 So.2d 736 (1964). Rather, the appellate courts treated dependency cases like any other custody battle, wherein the best interest of the child was the polestar and paramount consideration. See Sims v. State Dep't of Public Welfare, supra; Brill v. Johnson, 54 Ala.App. 39, 304 So.2d 591 (1974); and State Dep't of Pensions & Sec. v. Hall, 57 Ala.App. 290, 328 So.2d 295 (1976). This treatment was warranted due to the fact that a parent could always petition to regain custody of the child, as in ordinary custody cases.
In 1975, the legislature enacted the AJJA which explicitly authorized termination of parental rights. See Ala.Code 1975, ง 12-15-71(a)(5) (formerly ง 12-15-71(a)(6)). Unlike prior law which affected only a change in custody, the termination of parental rights "necessarily precludes the parent from later attempting to reestablish his or her visitation privileges, right to custody, or other parental rights with the child or children in question." Grayson, 419 So.2d at 237 (Bradley, J., concurring specially). At the same time, an order terminating parental rights divests the child of his or her right to maintenance and support and inheritance from the natural parent, to association with the natural parent, and other legal rights attendant to the parent-child relationship. See Ex parte Brooks, 513 So.2d 614 (Ala. 1987). Termination of parental rights is qualitatively different from a mere transfer of custody. See Hays v. Hays, 946 So.2d 867, 873 n. 7 (Ala.Civ.App.2006). Unlike an order divesting a parent of custody, a termination of parental rights is immediate, permanent, and irrevocable. *1212 See C.B. v. State Dep't of Human Res., 782 So.2d 781, 785 (Ala.Civ.App.1998) ("termination of parental rights is an extreme action that cannot be undone; it is permanent").
Despite this qualitative change in Alabama law, the courts construing the AJJA continued to recite the old custody law, including the "best interests" language. See, e.g., Rivera, supra. However, the AJJA, and the current CPA, does not simply provide for a change of custody of the child depending on the child's best interests. A parent whose rights have been terminated loses more than custody of the child. The parent loses all rights to the child, including even the right to visit the child. Hence, the "best interests" analysis used for custody changes should not and does not apply to termination-of-parental-rights cases.
The "best interests" language used by this court eventually found its way into the decisions of our supreme court. See, e.g., Ex parte Beasley, supra. That language has now become embedded in the law regarding termination of parental rights; however, this court, as the court invested with primary appellate review over juvenile cases, should not perpetuate an error of law. The juvenile courts depend on this court for guidance as to the proper construction and application of ง 26-18-7. We should make it clear that a juvenile court should not consider the best interests of the child when deciding whether grounds exists to terminate parental rights. The clearest indicator we could give would be to refuse to cite the "best interests" language in our cases. Because the main opinion insists that the "best interests" of the child are a factor for juvenile courts to consider in the adjudicatory phase of termination-of-parental-rights cases, I cannot concur in the analysis.
NOTES
[1] This case was originally assigned to another judge on this court. It was reassigned to Judge Thompson on July 26, 2007.
[2] Although the termination of the father's parental rights is not at issue in this appeal, we will nonetheless consider the factual circumstances surrounding the termination of his rights because he lives with the mother.
[3] See ง 13A-12-212, Ala.Code 1975.
[4] See ง 13A-12-211, Ala.Code 1975.
[5] See ง 13A-9-3, Ala.Code 1975.
[6] See ง 13A-7-8, Ala.Code 1975.
[7] Prosecution of the charge was apparently deferred pursuant to ง 12-23-5, Ala.Code 1975, which provides, in part:

"Any person arrested or charged with the violation of a controlled substance offense as set forth in Section[] 13A-12-212 ... may file a request with the district attorney having jurisdiction over the offense to enroll in a drug abuse treatment program in lieu of undergoing prosecution."
[8] Section 26-18-5(b), a part of the 1984 Child Protection Act, states, in part: "In the case of a child who has been in foster care under the responsibility of the department for 15 of the most recent 22 months, ... the department shall file a petition to terminate the parental rights of the parents of the child." Additionally, under the federal Adoption and Safe Families Act, unless specific conditions exist, "in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, ...[DHR must] file a petition to terminate the parental rights of the child's parents." 42 U.S.C. ง 675(5)(E).
[9] See also J.S. v. St. Clair County Dep't of Human Res., 969 So.2d 918, 922 (Ala.Civ. App.2007); T.C. v. Cullman County Dep't of Human Res., 899 So.2d 281, 291 (Ala.Civ. App.2004); B.M. v. State, 895 So.2d 319, 331 (Ala.Civ.App.2004); E.Z. v. Calhoun County Dep't of Human Res., 828 So.2d 332, 334 (Ala.Civ.App.2002); T.T. v. State Dep't of Human Res.; 796 So.2d 365, 367 (Ala.Civ.App. 2000); W.F. v. State Dep't of Human Res., 704 So.2d 483, 485 (Ala.Civ.App.1997); R.B. v. State Dep't of Human Res., 669 So.2d 187 (Ala.Civ.App.1995); K.M. v. Shelby County Dep't of Human Res., 628 So.2d 812, 813 (Ala.Civ.App.1993); Jones v. Hutchins, 474 So.2d 1152, 1154 (Ala.Civ.App.1985); Gaddy v. Alabama Dep't of Pensions & Sec., 428 So.2d 91, 93 (Ala.Civ.App.1983); Fitzgerald v. Jeter, 428 So.2d 84 (Ala.Civ.App.1983); and Phillips v. Alabama Dep't of Pensions & Sec., 394 So.2d 51, 53 (Ala.Civ.App.1981).
[10] See also note 9, supra.
[11] In Robles, this court stated: "Where, as here, the case is heard ore tenus and there is legal evidence to support the decree, this court will not substitute its judgment for that of the trial court." 368 So.2d at 42.
[12] See, e.g., Ex parte J.R., 896 So.2d 416, 423 (Ala.2004); Ex parte Beasley, 564 So.2d 950, 952-54 (Ala.1990); S.E. v. State Dep't of Human Res., 862 So.2d 664, 673 (Ala.Civ.App. 2003); M.C. v. KM., 788 So.2d 166, 173-74 (Ala.Civ.App.1999); T.P. v. S.P., 681 So.2d 624, 625 (Ala.Civ.App.1996); Clemons v. Alabama Dep't of Pensions & Sec., 474 So.2d 1143, 1145 (Ala.Civ.App.1985); Burnett v. Alabama Dep't of Pensions & Sec., 469 So.2d 627, 628 (Ala.Civ.App.1985); Redmon v. Alabama Dep't of Pensions & Sec. for Jefferson County, 460 So.2d 1317, 1318-19 (Ala.Civ. App.1984); and Lovell v. Department of Pensions & Sec., 356 So.2d 188, 189-90 (Ala.Civ. App.1978).
[13] Sections 26-18-1 to 26-18-10 were part of the original 1984 CPA; ง 26-18-11 was added in 1998.
[14] See also note 12, supra, and Columbus, 523 So.2d at 420.
[15] See notes 12 and 14, supra.
[16] See, e.g., R.P. v. State Dep't of Human Res., 937 So.2d 77, 80 (Ala.Civ.App.2006); Bowman v. State Dep't of Human Res., 534 So.2d 304, 305 (Ala.Civ.App.1988); Wishinsky v. State Dep't of Human Res., 512 So.2d 122 (Ala.Civ.App.1987); Wallace v. Jefferson County Dep't of Pensions & Sec., 501 So.2d 473, 476 (Ala.Civ.App.1986); Brown, 473 So.2d at 534 (citing Moore v. State Dep't of Pensions & Sec., 470 So.2d 1269, 1270 (Ala.Civ.App. 1985); Gaddy v. Alabama Dep't of Pensions & Sec., 428 So.2d 91, 93 (Ala.Civ.App.1983); Jeter, 428 So.2d at 84; Vinson v. AGAPE of Cent. Alabama, Inc., 416 So.2d 1075, 1077 (Ala.Civ.App.1982); and Phillips v. Alabama Dep't of Pensions & Sec., 394 So.2d 51, 53 (Ala.Civ.App.1981)); and McDonald v. Watkins, 18 Ala.App. 131, 131-32, 89 So. 306, 307 (1921). Cf. R.B. v. State Dep't of Human Res., 669 So.2d 187, 190 (Ala.Civ.App.1995); Wix v. State Dep't of Pensions & Sec., 464 So.2d 118, 119 (Ala.Civ.App.1985); Henderson v. Lessley, 387 So.2d 201, 202 (Ala. Civ.App.1980); Strickland v. Osborn, 333 So.2d 582, 584 (Ala.Civ.App.1976); Montgomery v. Hughes, 4 Ala.App. 245, 249, 250, 58 So. 113, 115 (1911)(citing Brown v. Brown, 2 Ala.App. 461, 466, 56 So. 589, 591 (1911); Saunders v. Saunders, 166 Ala. 351, 52 So. 310 (1910); Pearce v. Pearce, 136 Ala. 188, 33 So. 883, 884 (1903); and Woodruff v. Conley, 50 Ala. 304 (1874)).
[17] See also Ex parte State Dep't of Human Res., 624 So.2d 589, 593 (Ala. 1993); Fitzgerald v. Fitzgerald, 490 So.2d 4, 6 (Ala.Civ.App. 1986); Johnson v. State, 485 So.2d 1185, 1186 (Ala.Civ.App.1986); Haag v. Cherokee County Dep't of Pensions & Sec., 489 So.2d 586, 588 (Ala.Civ.App.1986); and Witcher v. Motley, 417 So.2d 208, 209 (Ala.Civ.App. 1982).
[18] As the main opinion correctly points out, the United States Supreme Court did not address the proper standard of appellate review of termination of parental rights judgments in Santosky. However, in Blackburn, supra, and in the other appellate decisions cited in the body of this special writing, the courts recognized that the same due-process considerations that warrant a heightened burden of proof โ as found by the Santosky court โ also require a heightened standard of appellate review. Thus, although Santosky is not binding authority requiring alteration of the ore tenus rule in termination-of-parental-rights cases, it is strong persuasive authority.
[19] As pointed out in the main opinion, the CPA is to be used "to protect the welfare of children by providing stability and continuity in their lives," Ala.Code 1975, ง 26-18-2; however, the statute further provides that, "at the same time," the CPA is to be used "to protect the rights of their parents." Id. This statement does not indicate that the legislature intended for the "best interests" analysis to be incorporated in ง 26-18-7 when to do so would impair the due-process rights of parents.
[20] The notion that a parent has no natural right to a child evidently has since been rejected by the United States Supreme Court. See, e.g., Santosky v. Kramer, supra.